SAM IOELE, Appellant-Respondent, v ALDEN PRESS, INC., et al., Respondents-Appellants, et al., Defendant.

First Department, January 19, 1989

## APPEARANCES OF COUNSEL

*Ambrose Richardson* of counsel *(McPheters & Richardson, P. C.,* attorneys), for appellant-respondent.

*Alan R. Friedman* of counsel *(Linda C. Goldstein* with him on the brief; *Kramer, Levin, Nessen, Kamin & Frankel,* attorneys), for Alden Press and Spier and Kosiek, respondents-appellants, and Gary Minnig, defendant.

*Edward J. Troy* of counsel *(Hogrefe, Stern & King,* attorneys), for Meehan-Tooker Co., Inc. and Thomas Murphy, respondents-appellants.

## OPINION OF THE COURT

SULLIVAN, J.

Defendants, Alden Press, Inc. and Meehan-Tooker Co., Inc., sister companies in the commercial printing business and wholly owned subsidiaries of John Blair & Company, and four officers of the two corporate defendants, cross-appeal from so much of an order as granted plaintiff leave to renew and, upon renewal, denied summary judgment as to the first and second causes of action alleging age discrimination, and reinstated the same.

Plaintiff was employed as a commissioned sales representative of the Chicago-based Alden from 1965 until December 1982, when he was transferred to Meehan-Tooker, which has its offices and printing facilities in East Rutherford, New Jersey. Nominally a sales representative, plaintiff acted more as a broker, in that he was authorized to assign sales to any of the sister companies. A third sister company, American Printers and Lithographers (AP&L), is not a party to this lawsuit. Plaintiff's principal clients throughout his relationship with Alden and until his resignation in January 1983, at the age of 55, were Reader's Digest and RCA Records.

In his age discrimination claim plaintiff alleges that the corporate defendants undertook a series of acts calculated to force him to resign. He argues that defendants' claim that their actions were motivated by legitimate business concerns is pretextual. More specifically, plaintiff claims that by late 1982 Alden and Meehan-Tooker had priced him out of the market. For example, Reader's Digest, his biggest customer, was confronted by what, he contends, was, in the sharply competitive world of commercial printing, an admittedly unprecedented 40% price increase. As a result, his commission base, on which he depended for all his income, had been cut by roughly 60%. The price increases, plaintiff further complains, had been preceded by a series of actions, such as the assignment of additional personnel to service his accounts and the practice of "farming out" or subcontracting his jobs to other printers, which were calculated to, and did, in fact, impair his relations with his principal customers. Prior to his resignation, plaintiff alleges, shortly after he had tried diplomatically to resolve his problems with Alden, his efforts, after 17 years of service as one of Alden's consistently most successful salespersons, were rewarded by a summary announcement of his transfer to Meehan-Tooker, the only such transfer involving salespersons ever to occur in Alden's history.

Defendants do not deny some of the incidents about which plaintiff complains, but insist their actions reflect the exercise of sound business judgment. They point out that in the late 1970's, plaintiff began to direct Reader's Digest brochure printing work to Meehan-Tooker because of its lower prices, the proximity of its New Jersey facility to the Reader's Digest plant in Rutland, Vermont, and its payment of a 5% commission for brochures, rather than Alden's 2% or 3%. Indeed, by 1980 only one half of plaintiff's Reader's Digest business went to Alden. The balance went to Meehan-Tooker and AP&L, which paid him a 10% commission. Moreover, by early 1982, Alden's once-monthly Reader's Digest orders for magazine inserts had dwindled to a handful a year. As of November 1982, only one fifth of plaintiff's Reader's Digest business was being printed at Alden.

Against this background and in the face of an increasingly competitive environment in the printing industry, the relationship between plaintiff and Alden apparently began to deteriorate. Plaintiff complained about Alden's "farmouts", allegedly without notice, to its competitor, Brookshore Lithographers, Inc., plaintiff's present employer and the rival whose

"strong sales effort" had diverted Reader's Digest magazine insert jobs from Alden. Yet, the record shows that Alden had to subcontract the Reader's Digest work at the last minute as a result of unforeseen difficulties on an earlier job. Plaintiff, however, lost none of his $1,736 commission as a result of the decision to subcontract the job, although Alden lost $14,000 from the unanticipated farmout. Plaintiff now argues that he was singled out in this incident. At his deposition, however, he acknowledged that Alden treated its other sales representatives in similar fashion. Although the record bears out that occasional farmouts without advance notice were indeed Alden's practice, plaintiff apparently contends that he and his clients deserved better treatment.

A February 11, 1982 visit by Ms. Galyon, a newly hired sales representative at Meehan-Tooker, to one of the buyers at Reader's Digest triggered another complaint. Apparently. Ms. Galyon told the buyer that she would be selling for Meehan-Tooker in the New York area. The buyer did not make any purchase from Ms. Galyon, but instead "advised [her] that there would be a conflict if she represented Meehan-Tooker." When plaintiff complained about the visit, Ms. Galyon's supervisor at Meehan-Tooker was notified by a written memorandum, with a copy to plaintiff, that Galyon was not to approach Reader's Digest "without [plaintiff's] approval." In fact, except for the Galyon incident, no Alden or Meehan-Tooker sales representative, other than plaintiff, ever solicited Reader's Digest, which, to this day, is one of plaintiff's principal accounts.

In August 1982, having found itself printing the product at a loss, Alden raised its price to Reader's Digest on magazine inserts for the first time in several years. Plaintiff claims that the increase was in retaliation for his February 1982 complaint about Ms. Galyon and caused him to lose potential commissions. But, as its actual cost sheets document, Alden did sustain losses or, at best, earned only minimal profits.

By the end of 1982 plaintiff was one of Alden's only commercial sales representatives with a wholly east coast clientele and, although his brochure and insert work had declined, Alden's catalogue printing business was thriving. Deciding that it no longer made sense for plaintiff to report to Alden in Chicago while his customers, virtually all of whom were in New York, were increasingly being serviced by Meehan-Tooker in New Jersey, Alden informed plaintiff that it had

decided to transfer him to Meehan-Tooker's sales force, effective January 10, 1983.

On January 21, 1983, Brookshore, having been contacted through an employment agency, offered plaintiff a position as a sales representative which he accepted, tendering his resignation four days later. Plaintiff's letter of resignation recited his disagreements with Alden's and Meehan-Tooker's business decisions, including such items as the Galyon visit to Reader's Digest, the price increases and farmouts, and his transfer to Meehan-Tooker, but did not mention any mistreatment on account of his age.

Yet, the only effect of the transfer to Meehan-Tooker, which plaintiff contends would have been "intolerable", was that he would report to the vice-president at Meehan-Tooker, rather than Alden. He already lived in New York City and Philadelphia. He remained a commissioned sales representative for all three Blair plants, servicing Reader's Digest and his other accounts, and his commission income would be the same. He would continue to represent AP&L, and to participate in Meehan-Tooker's medical plan, which was identical to Alden's. He was fully vested in Alden's profit-sharing plan; under the terms of the plans and as a matter of Federal law, he would have entered Meehan-Tooker's profit-sharing plan fully vested and would have received the same level of profit-sharing benefits as at Alden. In 1983, Alden and Meehan-Tooker each contributed 15% of its employees' compensation to its profit-sharing plan; in 1984 and 1985, each contributed 10%.

Several months after his resignation, plaintiff commenced this action, asserting, *inter alia*, two causes of action based on age discrimination. After joinder of issue and discovery, defendants moved for summary judgment dismissing all of the eight causes of action except for a $6,884.84 breach of contract claim, arguing that none of the events of which plaintiff complained evidenced age discrimination. The motion court granted the motions in their entirety, finding that plaintiff failed to sustain his initial burden of establishing a prima facie case of age discrimination.

Nearly five months later, plaintiff moved to renew his opposition to the summary judgment motions, submitting the affidavits of a former Meehan-Tooker employee and four "recently discovered" witnesses, as well as an analysis of telephone bills that he possessed prior to the summary judgment motions. He also offered a description of the Alden profit-

sharing plan and submitted Alden and Meehan-Tooker tax statements relating to their profit-sharing plans.

The court granted renewal, stating that "[w]hile certain of plaintiff's evidence may have been available at an earlier time [it] is satisfied that renewal should be granted due to the difficulties in assembling the evidence and preparing it for presentation." Upon renewal, the court adhered to its original decision granting summary judgment dismissing the other causes of action, but denied summary judgment as to plaintiff's age discrimination claims, finding that the new evidence presented issues of fact, including whether his resignation was voluntary.

As has been held repeatedly, "one opposing a motion for summary judgment must produce evidentiary proof in admissible form sufficient to require a trial of material questions of fact on which he rests his claim * * * mere conclusions, expressions of hope or unsubstantiated allegations or assertions are insufficient." *(Zuckerman v City of New York,* 49 NY2d 557, 562.) The rule is no different in discrimination cases. "[T]he salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation." *(Meiri v Dacon,* 759 F2d 989, 998, *cert denied* 474 US 829; *see also, Hill v Westchester Aeronautical Corp.,* 112 AD2d 977, 978.)

To succeed in his age discrimination claim, plaintiff must show that " 'age was the "determining factor" ' " in Alden's alleged ill treatment of him, that " ' "but for" his employer's motive to discriminate against him because of age, he would not have been discharged'." *(Pena v Brattleboro Retreat,* 702 F2d 322, 323, quoting *Loeb v Textron, Inc.,* 600 F2d 1003, 1019.) As this record makes clear, plaintiff cannot meet his burden. The purported issues of fact relied upon by the motion court are irrelevant to whether Alden discriminated against him because of his age, and the proof offered in support of the claim that his resignation was, in fact, a constructive termination is fatally deficient. Accordingly, we grant summary judgment and dismiss the first two causes of action alleging age discrimination.

Although not specifically identified in the complaint, plaintiff apparently relies on Executive Law § 296,[1] which prohibits

---

1. In relevant part, section 296 of the Executive Law states:
"3-a. It shall be an unlawful discriminatory practice:

discrimination based on age. In interpreting this statute, New York courts follow the shifting burden formula set forth in *McDonnell Douglas Corp. v Green* (411 US 792). *(See, Matter of Miller Brewing Co. v State Div. of Human Rights,* 66 NY2d 937, 938.)* In accordance with the holding of *McDonnell Douglas,* plaintiff bears the initial burden of establishing a prima facie case of age discrimination.

We note at this juncture that at the time of plaintiff's resignation, Alden employed 21 sales representatives and Meehan-Tooker 13. Of their 34 sales representatives, 11, including plaintiff, were over 50 years of age. Six were plaintiff's age, 55 or older. One 71-year-old Meehan-Tooker representative was its most active salesperson. Plaintiff's supervisor was 56.

In the absence of direct or statistical evidence "logically related to a differential treatment of employees on the basis of age in order to support an inference" of discrimination *(Stanojev v Ebasco Servs.,* 643 F2d 914, 921), both of which are concededly absent here, plaintiff may establish a prima facie case only if he can demonstrate that he was in a protected age group; that he was terminated; that he was sufficiently qualified to continue holding his position; and that his position was subsequently filled by a younger person or held open for a younger person. *(Menard v First Sec. Servs. Corp.,* 848 F2d 281; *Young v General Foods Corp.,* 840 F2d 825, 828; *Loeb v Textron, Inc., supra,* 600 F2d, at 1011.) At all stages of the case, however, plaintiff retains the burden of proving that the decision would not have been made " 'but for' his employer's motive to discriminate against him because of age". *(Supra,* at 1019; *accord, Kephart v Institute of Gas Technology,* 630 F2d 1217, *cert denied* 450 US 959.)

When plaintiff resigned the president of Alden and Meehan-Tooker urged him to stay. Thus, in order to make out a prima facie case, plaintiff must show that he was constructively discharged, which occurs when an employer " 'deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.' " *(Pena v Brattleboro Retreat, supra,* 702 F2d, at 325, quoting *Young v Southwestern Sav. & Loan Assn.,* 509 F2d 140, 144;

---

"(a) For an employer or licensing agency, to refuse to hire or employ or license or to bar or to terminate from employment an individual eighteen years of age or older, or to discriminate against such individual in promotion, compensation or in terms, conditions, or privileges of employment, because of such individual's age."

*see, Matter of Imperial Diner v State Human Rights Appeal Bd.,* 52 NY2d 72, 79 ["when the employer expressed his prejudice against the complainant and repeatedly refused to retract the statement, she was compelled to quit her job to avoid the abuse she had experienced and could well encounter in the future"].)

Although, as already noted, the motion court believed that plaintiff raised an issue of fact as to whether his "resignation was voluntary or a result of constructive termination", the evidence does not support such a finding, since "[t]here is no intimation that [his] working conditions had been made more onerous" *(Matter of Beal, Kagan, Lentz & Romasch v McCall,* 107 AD2d 648, 649) by defendants' actions. Plaintiff did not lose any commissions from the Galyon incident, and acknowledges that he lost none from the Brookshore farmouts. His transfer did not involve a change in title or reduce either his salary or benefits. He concedes that his earnings at Alden Press in 1982 were up substantially over 1981. Moreover, when he gave notice that he was leaving Alden and Meehan-Tooker, he was asked to stay. *(See, Pena v Brattleboro Retreat, supra,* 702 F2d, at 325-326.)

Even if plaintiff had made out a prima facie case, once an employer articulates a legitimate, nondiscriminatory reason for its actions, as defendants have here, then the burden shifts back to the plaintiff " 'to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination'." *(Matter of Miller Brewing Co. v State Div. of Human Rights, supra,* 66 NY2d, at 939, quoting *Texas Dept. of Community Affairs v Burdine,* 450 US 248, 253.) Plaintiff does not raise a jury issue merely by showing that the employer's decision was arbitrary or unsupported by the facts. As the court noted in *Gray v New England Tel. & Tel. Co.* (792 F2d 251, 255), "It is not enough for the plaintiff to show that the employer made an unwise business decision, or an unnecessary personnel move. Nor is it enough to show that the employer acted arbitrarily or with ill will. These facts, even if demonstrated, do not necessarily show that *age* was a motivating factor". Plaintiff "cannot meet his burden of proving 'pretext' simply by refuting or questioning the defendants' articulated reason". *(Dea v Look,* 810 F2d 12, 15.)

The issue is not whether defendants acted with good cause, but whether their business decisions would not have been made but for a discriminatory motive. For example, in *Dea*

*(supra)*, the plaintiff, an airport maintenance supervisor, had been terminated at the age of 58 and, thus, a prima facie showing of age discrimination demonstrated. The defendants claimed that they fired him because he had misappropriated aviation fuel. Dea stated "that he was terminated in an attempt to shift the blame for the airport gasoline scandal from management to the employees." *(Supra,* 810 F2d, at 14.) The court noted that "even if Dea convinced a jury that he was fired to protect higher-ups from blame in the gasoline scandal, this would not show age discrimination. It would merely provide another reason, totally unrelated to age, for his discharge." *(Supra,* at 15.)

More recently, in *Menard v First Sec. Servs. Corp.* (848 F2d 281, *supra)* the court affirmed on similar grounds the dismissal of an age discrimination claim by a 55-year-old "Area Manager." Once a prima facie case of age discrimination had thus been demonstrated, the employer attempted to meet its burden of production by claiming that Menard had been terminated because the customers with whom he dealt were unhappy with the services provided. Menard asserted that the problems the customers experienced were not his fault. The court held that the plaintiff had not made a sufficient showing of pretext to survive a motion for summary judgment. "Menard's proffered evidence does little but dispute the objective correctness of First Security's decision. * * * But even assuming it could be shown that First Security was wrong to blame [Menard], this would be insufficient to prove pretext or discriminatory intent." *(Supra,* at 287.)

Here, plaintiff attempted to prove pretext, like DEA and Menard, by challenging the correctness of defendants' business decisions. Like those plaintiffs, he could not connect any of the decisions to age bias. A discharged employee must do more than challenge the employer's decision as contrary to "sound business or economic policy," since such an argument does not give rise to the inference that the employee's discharge was due to age discrimination. *(See, Nash v Jacqueline Cochran, Inc.,* 548 F Supp 676, 681.)

The motion court also erroneously concluded that whether Alden followed trade practice on farmouts posed a material issue of fact. Trade practice was never the issue; Alden's practice was. Even plaintiff admits that Alden farmed out the work of other sales representatives. In fact, in 1983, Alden farmed out 16 jobs to various printers; the sales representatives ranged in age from 28 to 64. And, at least one other job

was farmed out without advance notice to the customer or to the 32-year-old sales representative.

Plaintiff insists Ms. Galyon visited Reader's Digest as a salesperson and not, as defendants contend, a "product manager". Yet, the visit, in whatever capacity, had nothing to do with plaintiff's age. According to the deposition testimony Ms. Galyon was attempting to increase business. She visited other Meehan-Tooker accounts, including one serviced by a 28-year-old sales representative. Moreover, plaintiff was assured, both personally and in writing, that Ms. Galyon would not go to Reader's Digest again without his express approval. She never did.

The motion court found issues of fact as to whether the price increases were justified and whether defendant Alden experienced losses on Reader's Digest inserts. But again, nothing in these price increases hints at age discrimination. Plaintiff offers only his own conjecture, and that of a "close friend" who was not privy to the Reader's Digest work, to challenge defendants' documentary proof of losses and marginal profits. The record shows that Alden lost money on individual insert jobs, often in the range of 1% to 49%. While plaintiff may challenge the extent of the loss, its size is not the issue. Moreover, Alden did not print any Reader's Digest inserts after the price rise, even after plaintiff's departure.

The motion court also found that whether plaintiff's transfer had a "good faith business rationale" presented an issue of fact. But the Alden defendants clearly sustained their burden of articulating a business rationale for plaintiff's transfer.[2] As Alden's president stated, "[plaintiff] was sending more and more work to Meehan, and less to Alden. * * * [Plaintiff's] business was focused virtually entirely on sales to the East Coast. His clients * * * were all located in New York City and environs. * * * Much of that business was more efficiently served by Meehan's New Jersey presses than by Alden's in Illinois. * * * In addition, Alden's sales were increasing significantly because of growth in our catalogue business. Mr.

---

2. The motion court's formulation suggests that in order to defeat plaintiff's prima facie case, defendants had to prove a good-faith business rationale. Their burden of production, however, does not require the Alden defendants to prove that their actions were motivated by a factor other than age discrimination. " 'To dispel the adverse inference from a prima facie showing * * * the employer need only "articulate some legitimate, nondiscriminatory reason" ' " for the employer's action (*Board of Trustees v Sweeney*, 439 US 24, quoting *Furnco Constr. Co. v Waters*, 438 US 567, 578).

Kosiek, [plaintiff's] supervisor, was unable to provide sufficient management supervision for [his] accounts." As already noted, the transfer itself had no effect on plaintiff's income or benefits. It meant only that he would report, in the first instance, to another supervisor. In any event, in questioning Alden's reasons for his transfer, plaintiff is quarreling with the rationale of its business decision, which, as already noted, does not give rise to the inference of age discrimination. *(See, Nash v Jacqueline Cochran, Inc., supra,* 548 F Supp, at 681.)

Finally, we note that plaintiff's own theory of his case has nothing to do with age, but rather with experience and independence. "[A]ge discrimination", he testified at his deposition, "starts in my case because as a senior mature salesman, established with some top national accounts, it gives the company more control if a younger and less experienced salesman is on the account." In *Kephart v Institute of Gas Technology* (630 F2d 1217, *supra),* a similar argument was considered and rejected. "When asked about the reasons for age discrimination at IGT, Kephart stated that the company wanted people with less experience so that it would be able to control the way they performed projects. * * * Thus, Kephart's own statements reveal that the company's discrimination was not so much against age as against experience and independence." *(Supra,* at 1224.) In an opinion adopted and affirmed by the Seventh Circuit, the District Court granted defendant's motion for summary judgment and dismissed plaintiff's age discrimination claim.

Plaintiff's theory also fails because Alden would have no interest in driving away an independent sales representative, such as plaintiff, whose "independence" was based, not on age, but on having loyal clients who could, and did, sent him their business, wherever he was employed. He brought Reader's Digest and RCA as clients when he came to Alden in 1965, and took them with him when he left.

Thus, defendants' motions for summary judgment dismissing the age discrimination claims should have been granted. We have examined the other issues raised by this appeal and find that they are without merit.

Accordingly, the appeals from the judgments of the Supreme Court, New York County (William P. McCooe, J.), entered May 14, 1987 and May 26, 1987, respectively, should be dismissed, without costs or disbursements, as superseded. The order of the same court and Justice entered January 22,

1988, which granted plaintiff's motion to renew and, upon renewal, *inter alia,* denied defendants' motions for summary judgment on the first two causes of action alleging age discrimination, should be modified, on the law, to grant defendants' motions for summary judgment on the first two causes of action and to dismiss the same and, except as thus modified, affirmed, without costs or disbursements.

KUPFERMAN, J. P. KASSAL, ELLERIN and SMITH, JJ., concur.

Order, Supreme Court, New York County, entered on January 22, 1988, unanimously modified, on the law, to grant defendants' motions for summary judgment on the first two causes of action and to dismiss the same, and except as thus modified, affirmed, without costs and without disbursements; and the appeals from two judgments of the Supreme Court, New York County, entered on May 14, 1987 and May 26, 1987, respectively, unanimously dismissed, without costs and without disbursements, as superseded.