*100 OPINION OF THE COURT
Anthony J. Carpinello, J.
There are two motions pending in this action: a motion by the defendants Benedictine Hospital (Hospital) and Dr. A. John Blair for summary judgment pursuant to CPLR 3212 and a motion by the plaintiff Dr. Benjamin J. Kripke to amend his complaint to add Benjamin J. Kripke, M.D., P. C. as a party to this action. Plaintiff served as chairman of the Hospital’s anesthesiology department from 1983 until his departure in 1992. In this case, plaintiff’s claim is that he was constructively discharged from his position at the Hospital after being subjected to a politically motivated campaign of criticism.
The parties have introduced voluminous submissions setting forth the factual background for this controversy. Briefly, in January of 1991, plaintiff, as president of Benjamin J. Kripke, P. C. (the P. C.), signed a contract with the Hospital whereby the P. C. agreed to furnish anesthesia services. Plaintiff would also continue to serve as the chairman of anesthesiology for the Hospital. Although plaintiff disputes this, the documentary evidence before this court makes it clear that the anesthesia department was perceived as having certain problems as early as 1989. In October of 1989, minutes from an operating room committee meeting reveal concern that a reduction in surgeries at the Hospital was in part attributable to "the instability of the Anesthesia Department [rapid turnover of anesthesiologists and frequent absences of the Chairman]”. At a November 1989 meeting of the operating room committee, plaintiff was advised that the department of surgery was concerned about perceived instability in the anesthesia department. The problem of "instability” in the anesthesia department was also a topic of conversation at a November 1989 meeting of the department of surgery.
Minutes from operating room committee meetings reveal that concerns about rapid turnover and adequate staffing in the anesthesia department continued into 1990. In fact, in August of 1990, the department of surgery expressed a vote of no confidence in the anesthesia department. Even at the Board of Directors meeting approving plaintiff’s contract in January of 1991, concern was raised about the credentialling of anesthesiologists and certified registered nurse anesthetists prior to the commencement of employment at the Hospital. In February of 1991, the department of medicine joined with the department of surgery in voicing its concerns about the problems with the anesthesia department.
*101 In January of 1992, the department of surgery noted that it had had no response from the Board of Directors about its 1990 vote of no confidence and decided to send a letter to the Board expressing its concerns. At a February meeting, concern was again voiced about turnover in the anesthesiology department and the surgery department invited plaintiff to address the surgery department. A number of issues were discussed at this meeting, including the vote of no confidence in the department, the fact that conditions in the department appeared to be deteriorating, the lack of quality of staff anesthesiologists, the perceived overuse of locum tenens, or temporary anesthesiologists, the perception that plaintiff was too frequently absent from the Hospital, his unavailability to attend meetings, the erosion of morale in the operating room, the decline in operating room volume and the resultant loss of revenue to the Hospital, and the unavailability of anesthesiologists to meet with surgeons prior to surgery on difficult cases. The minutes state that "[w]hile Dr. Kripke attempted to answer the concerns of the surgeons, the department [of surgery] in general, felt he did not answer the questions to their satisfaction. A major unanswered question was how he plans to improve/ correct the situation”.
In May of 1992, the plaintiff sent a letter to the Hospital’s president setting forth a settlement proposal for the termination of his contract with the Hospital. The proposal was rejected. Thereafter, in June of 1992, the Board of Directors passed a resolution declaring that there was a crisis in the department of anesthesiology and imposing certain new requirements on the operation of the department. Most significantly for purposes of this litigation, the resolution required the plaintiff to work full days on Mondays and Fridays. Apparently, because the plaintiff also maintained a residence in the Boston area, the Hospital was operating under the impression, justified or not, that plaintiff had been leaving early on Fridays and arriving late on Mondays. Additionally, the resolution required plaintiff to be on call one weekend out of four. The resolution required that plaintiff take whatever steps necessary to stabilize the department of anesthesiology. Shortly thereafter, the plaintiff was informed that the Hospital did not intend to renew plaintiff’s contract once it expired in December of 1994.
Plaintiff responded to the resolution with a letter of his own on July 15, 1992. Terming the resolution "egregious” and "disingenuous”, he indicated that he had no problem with *102 most of the resolution, but he termed the Hospital’s demand that he be on call one weekend out of every four "unfair”. At a July meeting of the Board, an ad hoc anesthesia crisis committee was formed to review the matter. The Board indicated at this meeting that it intended henceforth to hold plaintiff to the letter of his contract with the Hospital.
Thereafter, the relationship between the parties continued to deteriorate. An August 31, 1992 letter from the Hospital setting forth 13 separate demands closed with the warning that "[f]ailure to follow any and all of these duties and responsibilities will be deemed by the Board to be a breach of your contractual obligations as Chairman of the Department of Anesthesia”. On September 3, 1992, plaintiff responded to the Hospital’s letter point-by-point, but denied that the department of anesthesia could properly be termed to be "in crisis”. Meetings of the Anesthesia Crisis Task Force took place on September 4, 1992 and September 11, 1992. Throughout the month of September, Thomas A. Dee, the Hospital’s executive vice-president, sent a series of letters to the plaintiff regarding perceived problems within the anesthesia department. In mid-September, the plaintiff sustained a heart attack. Following plaintiff’s heart attack, Dee sent six additional letters to plaintiff regarding purported problems in the anesthesia department. On November 17, 1992, plaintiff’s attorney sent a letter to the Hospital to the effect that plaintiff deemed himself to have been constructively terminated and indicating that he intended to leave the Hospital effective December 1, 1992. Thereafter, the plaintiff accepted a position with Boston City Hospital. Plaintiff had interviewed for the position in the summer of 1992 and had been offered the position that September, shortly after he suffered his heart attack.
The instant action was commenced weeks later. The summons and complaint herein were filed in the office of the Ulster County Clerk on January 29, 1993. The complaint contained a cause of action for constructive discharge against the Hospital, a cause of action for intentional infliction of emotional distress against the Hospital, and a cause of action against defendant Blair for tortious interference with contractual relationships.
The court will first consider the plaintiff’s first cause of action for constructive discharge. The plaintiff contends that the Hospital’s "campaign of threats” was "designed to create such duress as to force Dr. Kripke to unilaterally resign his position as Chairman of the Anesthesiology Department of the hospital”. He claims that these conditions made his continued per *103 formance "untenable and unhealthy” and that the Hospital is consequently liable in damages for breach of contract in the sum of $1 million.
The Hospital points out that the contract at issue here was not between plaintiff and the Hospital but between the P. C. and the Hospital. The Appellate Division has held that where a hospital contracts with a professional corporation for the furnishing of services, the individual physician does not possess a cause of action for breach of that contract if he or she was not a party to the contract (see, e.g., Del Castillo v Bayley Seton Hosp., 172 AD2d 796, 798; Burdett v Samaritan Hosp., 158 AD2d 132, 135).
Plaintiff now seeks to correct his failure to include the P. C. as a party to this action through his motion to amend pursuant to CPLR 3025 (b). However, this case is complicated by the fact that the P. C. has filed for protection under the Bankruptcy Code and a bankruptcy trustee has been appointed. The trustee has indicated to counsel that he does not intend to take any action with respect to this case until the motion for summary judgment has been decided. This court has not received any motions from the trustee with regard to this case. The Appellate Division has held that once an individual or a corporation has filed for bankruptcy, the debtor loses the capacity to prosecute actions on its own behalf and that right passes to the trustee (see, e.g., Schepmoes v Hilles, 122 AD2d 35, 36; Emergency Beacon Corp. v Polish, 71 AD2d 995). Therefore, because the right to pursue this cause of action belongs neither to Dr. Kripke nor the P. C. but to the bankruptcy trustee, and because the bankruptcy trustee has not taken any steps to pursue this action on behalf of the P. C., this court denies plaintiff’s motion to amend. Plaintiff’s motion to add the P. C. as a party pursuant to CPLR 2001 is denied for the same reason.
To the extent that the first cause of action alleges that the individual plaintiff Benjamin Kripke was constructively discharged, an examination of the applicable State and Federal precedent is in order. The bulk of the cases addressing this area of the law and cited by the parties are Federal cases (but see, Imperial Diner v State Human Rights Appeal Bd., 52 NY2d 72). This is no doubt due in no small part to the fact that New York has not recognized a cause of action for wrongful discharge in the absence of a contractual or other restriction upon the employer’s ability to fire at will (see, e.g., Murphy v American Home Prods. Corp., 58 NY2d 293). Here, there was *104 an employment contract, albeit between the P. C. and the Hospital. The Appellate Division has, however, looked to Federal cases for guidance in this area. In loele v Alden Press (145 AD2d 29), the Court defined "constructive discharge” as when an employer " ' "deliberately makes an employee’s working conditions so intolerable that the employee is forced into an involuntary resignation” ’ ” (supra, at 35, quoting Pena v Brattleboro Retreat, 702 F2d 322, 325; see also, Matter of Beal, Kagan, Lentz & Romasch v McCall, 107 AD2d 648, 649). For that reason, this court similarly looks to Federal authority in this area for guidance in determining whether plaintiff has stated a .cause of action for constructive discharge.
"In determining whether or not a constructive discharge has taken place, 'the trier of fact must be satisfied that the * * * working conditions would have been so difficult or unpleasant that a reasonable person in the employee’s shoes would have felt compelled to resign’ ” (Pena v Brattleboro Retreat, supra, at 325 [citations omitted]). The United States Court of Appeals for the Second Circuit has held that unless the evidence is sufficient to permit a rational trier of fact to find that the employer deliberately created working conditions that were of the requisite degree of unpleasantness, as defined in Pena (supra), "a claim of constructive discharge should be dismissed as a matter of law, whether by judgment setting aside a. verdict in the plaintiffs favor * * * or by summary judgment” (Spence v Maryland Cas. Co., 995 F2d 1147, 1156). The Second Circuit has held that a claim of constructive discharge is not made out simply based upon allegations that the employee’s work was criticized, even if the employee views that criticism as unfair (Stetson v NYNEX Serv. Co., 995 F2d 355, 360, citing Clowes v Allegheny Val. Hosp., 991 F2d 1159, 1160-1161; see also, Spence v Maryland Cas. Co., supra, at 1156).
Further, while courts have found constructive discharge on the basis of evidence that the employer deliberately put an employee in a position that jeopardized the employee’s health, as where, for example, a pregnant employee was transferred to a position requiring heavy manual labor (Meyer v Brown & Root Constr. Co., 661 F2d 369, 371-372), the mere fact that an employee may have a pre-existing physical condition or may develop a stress-related medical condition does not necessarily compel the conclusion that an employee has stated a cause of action for constructive discharge (Spence v Maryland Cas. Co., supra, at 1156; see also, Carter v Caring for the Homeless, 821 F Supp 225, 231).
*105 Having looked to this precedent for guidance, this court must conclude that plaintiff has fallen well short of demonstrating that he was constructively discharged from his position at the Hospital. Although the plaintiff argues vigorously that he was subjected to a politically motivated campaign of harassment, the record before this court reveals that the operation of the anesthesia department and the performance of plaintiff as chairman of that department had been a source of concern within the Hospital for a period of at least three years before the Board issued its resolution declaring a crisis within the department in June of 1992. In fact, in September of 1990, two years before the plaintiff resigned from the Hospital, the department of surgery issued a vote of no confidence in the anesthesia department.
Plaintiff also seems to be arguing that the Hospital’s imposition of new conditions upon his employment after the adoption of the June 1992 resolution similarly gives rise to a claim for constructive discharge. Many of the "new” conditions, such as the Hospital’s request that plaintiff give 30-day advance notice of his intent to take vacation time and that he retain five permanent anesthesiologists, are in fact contained in the agreement. The two conditions that appeared to have irked plaintiff the most were the request that he take call one weekend out of every four and the scheduling of the Task Force meetings on Fridays at five in the afternoon. The former is, incidentally, a condition of plaintiff’s current employment. This court simply cannot conclude that the Hospital’s unwillingness to accommodate the plaintiff’s desire to get away on the weekends gives rise to a constructive discharge claim.
In addition, while certainly not determinative, the fact that plaintiff was apparently interviewing for a new job in the Boston area while matters were coming to a head at the Hospital does not do much to advance his claims of constructive discharge. At least one Federal court has expressed an unwillingness to find constructive discharge when an employee chooses to stay at one job while looking for another (Wagner v Sanders Assocs., 638 F Supp 742, 746).
To the extent that plaintiff argues that his heart attack was attributable to the deteriorating situation at the Hospital, he has failed to introduce any medical evidence to substantiate this claim. Finally, this court cannot conclude that the mere fact that Thomas Dee sent six letters to plaintiff during the nearly two-month period between plaintiff’s heart attack and his notification that he would be resigning from the Hospital *106 gives rise to a claim of constructive discharge. The Hospital claims, and plaintiff does not dispute, that plaintiff did not designate anyone to field questions or complaints during his recovery. It is unclear from the record why he did not do so. Under these circumstances, this court cannot conclude that the Hospital’s continued practice of writing to plaintiff about perceived problems within the department during his recovery created such an intolerable situation as to mandate his resignation. It was, at worst, unwelcome criticism, which the Federal courts have held repeatedly does not give rise to a constructive discharge claim.
In short, this court concludes that the plaintiff has completely failed to demonstrate that he was constructively discharged. In fact, he has sought to expand the theory of constructive discharge to the point where it would prevent an employer from criticizing an employee’s performance or changing the conditions of employment, even if such change was prompted by concerns about the employee’s performance. It would appear to this court that such an expansion of the theory of constructive discharge would be especially unwise where the employer is a hospital and the employee is a physician. In an environment where the slightest deviation from acceptable standards of care might well result in a malpractice action, the Board of Directors had a legal and indeed a moral obligation to ensure that adequate standards were maintained in the anesthesiology department. Therefore, to the extent that plaintiff’s first cause of action may be read as asserting an individual claim for constructive discharge, it too is dismissed. The plaintiff’s first cause of action is thus dismissed in its entirety.
Plaintiff’s second cause of action is for intentional infliction of emotional distress. As noted above, the plaintiff has failed to introduce any evidence linking his heart attack to the allegedly intolerable working conditions at the Hospital. Liability for intentional infliction of emotional distress has been found " 'only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community’ ” (Fischer v Maloney, 43 NY2d 553, 557, quoting Restatement [Second] of Torts § 46 [1], comment d). The conduct alleged by plaintiff in this case again falls well short of satisfying this standard. The mere fact that the Hospital saw fit to criticize plaintiff’s performance as chairman does not subject the Hospital to liability on a theory that such behavior is intolerable in a civilized society (see, *107 e.g., Hoheb v Pathology Assocs., 146 AD2d 919). Similarly, the Hospital’s decision to continue writing to plaintiff after his heart attack appears to have been motivated in part by the fact that plaintiff had not designated anyone within the department to respond to the Hospital’s concerns about the operation of the anesthesia department during plaintiff’s recovery. Even taking the plaintiff’s allegations as true, the conduct engaged in by the Hospital and its personnel in this case simply is not sufficiently atrocious and outrageous as to subject the Hospital to liability for the intentional infliction of emotional distress. Accordingly, the plaintiff’s second cause of action is also dismissed.
Finally, the plaintiff’s third cause of action is against the defendant Blair for tortious interference with the contractual relationship between the Hospital and the P. C. Wholly apart from the question of whether the plaintiff has standing to assert this claim on behalf of the nonparty P. C., this court concludes that this cause of action is similarly without merit and should also be dismissed as a matter of law. Blair is a member of the Hospital’s department of surgery and has served as a member of the Board of Directors since July of 1992. The complaint contains allegations that Blair disparaged the plaintiff’s performance to others in the Hospital and that this course of criticism was tortious in nature. "Intentional interference with contractual relations is * * * recognized as a tort * * * But the interference must be intentional, not merely negligent or incidental to some other, lawful, purpose” (Alvord & Swift v Muller Constr. Co., 46 NY2d 276, 281). It is defendants’ position on this motion that this cause of action must be dismissed because Blair’s criticism of plaintiff’s performance was undertaken as part of his responsibility to ensure the well-being of the Hospital and its patients. The Appellate Division has held that a defendant’s exercise of an "equal or superior legal * * * right * * * to express his honest although critical opinion of the plaintiff’s performance of [his] duties precludes a finding that he was motivated solely by malice and justifies his commission even of what otherwise might amount to an actionable wrong” (Leibowitz v Szoverffy, 80 AD2d 692, 693, mod 80 AD2d 981). The court is satisfied that Blair has made a prima facie showing that this cause of action lacks merit.
"In order to defeat this motion for summary judgment it was incumbent upon the plaintiff, in view of defendant’s prima facie showing that on the law and the facts the action lacks merit, to come forward and lay bare his proofs of evidentiary *108 facts showing that there is a bona fide issue requiring a trial” (Hanson v Ontario Milk Producers Coop., 58 Misc 2d 138,. 141-142). Dr. Kripke has done woefully little to demonstrate the existence of evidentiary facts that would support this claim. Plaintiff testified at his deposition that it was his impression that Blair’s criticism was motivated by his desire to enhance his own status at the Hospital at plaintiffs expense. However, the Appellate Division has held that even where a defendant’s actions are motivated by economic self-interest, they cannot be characterized as malicious for purposes of tortious interference with contract (Nassau Diagnostic Imaging & Radiation Oncology Assocs. v Winthrop-University Hosp., 197 AD2d 563, 564). Further, it is apparent from the record in this case that Blair was certainly not the only doctor in Benedictine Hospital who criticized the anesthesia department and plaintiff’s performance as chairman in the period leading up to plaintiffs resignation. In fact, on the record before this court, it is difficult to determine exactly why the defendant Blair was singled out and named as a party defendant. Thus, given the climate that existed in the Hospital in the months before plaintiffs resignation, this court cannot conclude that Blair’s criticism, even if motivated by self-iriterest, rises to that level of malicious conduct as is required for a showing of tortious interference with contract.
In conclusion, this court finds that the plaintiff has failed to demonstrate the existence of factual issues requiring a trial of this matter. Accordingly, the defendants’ motion for summary judgment is granted in its entirety and the complaint dismissed.