Robert A. FITZGERALD, Plaintiff,

v.

ALLEGHANY CORP., et.
ano., Defendants.

No. 94 Civ. 3564 (LAK).

United States District Court,
S.D. New York.

Nov. 17, 1995.

Rudolph E. Greco, Jr., Jackson Heights, NY, for Plaintiff.

Benton J. Mathis, Jr., Drew, Eckl & Farnham, Atlanta, GA, John C. MacCrate, III, Bigham, Englar, Jones & Houston, New York City, for Defendant.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Plaintiff Robert Fitzgerald alleges that his employer, Chicago Title Insurance Co. ("Chicago Title"), discriminated against him on the basis of disability in violation of New York law when it discharged him upon learning that he was seeing a psychiatrist who had prescribed Prozac and Klonopin for depres-

sion.[1] The discharge took place in the context of a consolidation of Chicago Title and Ticor Title Guaranty Co. ("Ticor") that resulted in substantial layoffs. Chicago Title moves for summary judgment on a number of grounds, arguing that the alleged disability is not protected and that plaintiff fails to raise a triable issue of fact as to whether discriminatory animus motivated the discharge.[2]

## Facts

### The Ticor–Chicago Title Acquisition

Fitzgerald began working for Ticor in July 1987, and by early 1991 he was a Senior Vice President and the New York City Zone Manager. Ticor and Chicago Title were then direct competitors, each with a New York City branch office.

On March 8, 1991, Chicago Title acquired the assets of Ticor, and Fitzgerald became an employee of Chicago Title. During Fitzgerald's employment with Chicago Title, he reported to Gary Cortellessa, the then New York City Area Manager. Cortellessa reported to Michael Lewis, the Senior Vice President and Northeastern Regional Manager. Ruth Lundy served as the Northeast Region Human Resources Manager.

About a month after the acquisition, all Chicago Title and Ticor functions in New York City were consolidated into a single office. The two companies employed approximately 180 people in their New York operations, many with overlapping functions. In consequence, during the period between March 8, 1991 and September 17, 1991, Chicago Title terminated over fifty employees due to the integration of Ticor's and Chicago Title's New York operations. Fitzgerald was involved in terminating many of these employees, personally conducting most of the termination meetings.

### Fitzgerald's Termination

The decision to terminate Fitzgerald was made between September 13 and 16, 1991, by Cortellessa, approved by Lewis, and discussed with Lundy, who concurred in the decision. At that time, Chicago Title was consolidating its national business structure from approximately eight regions into three operation divisions. Cortellessa was to be transferred to the Mid–Atlantic Area, which would become part of a newly created Northeast Division.

According to Chicago Title, along with this change in structure, it was necessary to select someone for the position of New York City Branch Manager. The candidates were Fitzgerald and Marion Latham, who had been the Chicago Title New York City Branch Manager before the acquisition and performed special functions during the acquisition period, including installing and supervising a computer project. According to Cortellessa's deposition testimony and the interrogatory answers verified by Cortellessa, Latham was viewed as having the technical abilities needed to manage the operations, and it was agreed unanimously that she was more qualified for the position than Fitzgerald. In consequence, Chicago Title decided to appoint Latham and terminate Fitzgerald.

The decision to terminate Fitzgerald was made while Fitzgerald was at Chicago Title's corporate headquarters for a training meeting. When Fitzgerald returned from Chicago on September 17, 1991, Cortellessa told him that Chicago Title no longer had a position for him as a result of further restructuring and consolidation. In response, Fitzger-

---

1. Plaintiff has asserted that his depression stemmed from his inability to control his weight and latent alcoholism together with anxiety and stress. However, plaintiff has clarified that his claim is not that he was fired on the basis of his weight or alcoholism. (Pl's–Respondent's Statement of Undisputed Facts in Opp. to Def's Mot. for Sum. Judg. ¶¶ 20–21, 24–32)

2. This dispute has had a torturous history. Fitzgerald initially sued in this Court under the Americans with Disabilities Act ("ADA") but voluntarily dismissed upon learning that the events at issue preceded the effective date of the ADA.

About a year later, he brought this action under N.Y.Exec.L. § 296–1 (McKinney 1993), New York's Human Rights Law, in the State court. The defendants then removed on the basis of diversity of citizenship, and Chicago Title moved for summary judgment on the ground that the prior federal dismissal was *res judicata*, a motion this Court denied. *Fitzgerald v. Alleghany Corp.*, 882 F.Supp. 1433 (S.D.N.Y.1995). The other defendant, Alleghany Corporation, had been dismissed previously by stipulation. *Id.* at 1434 n. 1.

ald told Cortellessa that he had known for some time that he would be terminated.

### The Claim of Discrimination

Fitzgerald contends that Chicago Title's reason for terminating him was pretextual, in that he was perfectly qualified for the branch manager position, and that discriminatory animus motivated his discharge. It is therefore necessary to examine the evidence on both points.

### Fitzgerald's Performance

Chicago Title has offered substantial evidence that Fitzgerald's performance after the acquisition justified the determination that Latham was the more qualified candidate. Fitzgerald had difficulty with certain accounting responsibilities and had an unacceptable level of late titles.[3] (Def's 3(g) Statement ¶¶ 46–47, 57; Cortellessa Dep. 57–58; Cortellessa Aff. ¶ 2; Vitale Aff. ¶ 2; Fitzgerald Dep. 191, 198)

Fitzgerald admits that the level of late titles was unacceptable and does not deny his difficulties with accounting chores. (Fitzgerald Dep. 191, 198) Rather, he contends that the problems were not his fault, but products of a hectic transition period, a lack of training, and/or mismanagement by others. (Pl's 3(g) Statement ¶¶ 45–46,[4] 56–57; Fitzgerald Dep. 187, 191, 204–205) He characterizes defendant's affidavits as self-serving. And he points to the facts that he was named Resident Vice President of Chicago Title and that he, but not Latham, received an integration bonus after the acquisition as evidence that his performance was satisfactory. Chicago Title, however, has explained that the bonus was paid in recognition of Fitzgerald's difficult role in terminating former Ticor colleagues. (Lewis Dep. 7) The Resident Vice President appointment was made by form letter pursuant to preacquisition plans to appoint all Ticor officers to corresponding offices in Chicago Title so they could act on behalf of Chicago Title during the transition; the appointment involved no pay increase or additional responsibilities. (Def. 3(g) Statement ¶ 10; Cortellessa Dep. 48; Lundy Dep. 49; Lundy Aff. Ex. 2)

### Discriminatory Animus

Fitzgerald points to two incidents to demonstrate that Chicago Title was aware of, and was influenced by, his alleged disability.

The first instance occurred during a conversation with Cortellessa in the summer of 1991. According to Fitzgerald's affidavit, he had a conversation with Cortellessa about "my psychological problems and the advisability of submitting these medical bills for reimbursement." (Fitzgerald Aff. ¶ 17) In his deposition, Fitzgerald added that he told Cortellessa that he was seeing a therapist due to weight problems. (Fitzgerald Dep. 141) Fitzgerald explained further that Cortellessa sympathized, told Fitzgerald that Cortellessa's wife was seeing a therapist as well, and encouraged Fitzgerald to submit his medical bills for reimbursement if he were seeing a psychiatrist. (Fitzgerald Dep. 142–44) Fitzgerald admitted that Cortellessa did not say or do anything at that time to indicate that Cortellessa had a problem with the fact that Fitzgerald was seeing a therapist and did not denigrate his own wife for seeing a therapist. (Fitzgerald Dep. 144–145)[5]

The second instance occurred during a banquet in Chicago on September 11, 1991, where, according to Fitzgerald, he volunteered similar information to Caroline Carter and La Nette Zimmerman, two human re-

---

3. Indeed, according to notes by Dr. Oguro, the psychiatrist who treated Fitzgerald, Fitzgerald told him on August 7, 1991, one month before he was terminated, that he was "going through a rough time on [his] job" and dealing with his "character defects in procrastination, laziness, etc." (Def's 3(g) Statement ¶ 69 (referring to Pl's Dep. Ex. 4))

4. In certain places, such as here, plaintiff's response to defendant's statement of undisputed facts appears to be a paragraph number off in corresponding to defendant's statements. Some-

times plaintiff's responses are so general (i.e., simply alleging that the statements by Chicago Title managers were "self-serving" or reflective of a "coverup") that it is especially unclear which particular assertions plaintiff was responding to.

5. Cortellessa's recollection of the conversation was more vague. He remembers only a discussion in which he encouraged Fitzgerald to submit some medical bills for reimbursement, without knowing whether the provider was a therapist or nutritionist. (Cortellessa Dep. 88–89)

sources executives at Chicago Title. In his affidavit, Fitzgerald stated that he told these women he was "receiving psychiatric care for depression due to a chronic overweight problem," was a recovering alcoholic, and was taking prescription anti-depressants. (Fitzgerald Aff. ¶ 21) In his deposition, Fitzgerald acknowledged that neither Carter nor Zimmermann reacted with any shock or surprise, or suggested that they were bothered or offended or that there was going to be a problem. (Fitzgerald Dep. 171) [6]

Zimmerman and Carter played no role in the decision to terminate Fitzgerald. Uncontradicted evidence establishes that neither Zimmerman nor Carter mentioned their conversation with Fitzgerald on September 11 to anyone else before the termination. (Carter Aff. 3, ¶ 7; Zimmerman Aff. 3, ¶ 7; Lundy Dep. 86; Lewis Dep. 17–18; Cortellessa Dep. 55–56) [7]

### Discussion

■ Summary judgment in employment discrimination cases must be approached with great caution, especially when the employer's intent is at issue. *Gallo v. Prudential Residential Services, Ltd. Partnership*, 22 F.3d 1219, 1224 (2d Cir.1994). Neverthe-

less, there are circumstances in which summary judgment in such cases is appropriate.[8] After examining the record carefully and resolving all disputed facts, *arguendo*, in plaintiff's favor, this is one of those cases. Plaintiff has failed to meet his burden of raising a triable issue of fact as to whether the employer's decision was motivated, either in whole or in part, by discrimination on the basis of disability.

### Standard of Proof

■ The standards governing the burdens of proof in employment discrimination cases under the New York Human Rights Law typically are the same as those that apply in Title VII cases. *See Sogg v. American Airlines, Inc.*, 193 A.D.2d 153, 155, 603 N.Y.S.2d 21, 23 (1st Dept.1993), *leave to appeal dismissed*, 83 N.Y.2d 846, 612 N.Y.S.2d 106, 634 N.E.2d 602 (1994); *Ioele*, 145 A.D.2d at 36, 536 N.Y.S.2d at 1004; *cf. Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1180, 1182 (2d Cir.), *cert. denied*, 506 U.S. 826, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992) (stating that New York courts consistently have looked to federal case law in interpreting the New York Human Rights Law, but declining to incorpo-

**6.** Carter and Zimmerman stated by affidavit that they did not recall Fitzgerald mentioning that he was receiving psychiatric care for treatment of depression. (Carter Aff. 2, ¶ 6; Zimmerman Aff. 2, ¶ 6)

**7.** Fitzgerald claims no knowledge that Zimmermann and Carter told anyone in New York about the conversation before the termination. (Fitzgerald Dep. 172–73)

**8.** *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14 (2d Cir.1995) (affirming grant of summary judgment because plaintiff failed to prove facts giving rise to an inference of discrimination on the basis of ethnicity under Title VII); *Gill v. Reorganized School District R–6, Festus, Mo.*, 32 F.3d 376 (8th Cir.1994) (affirming grant of summary judgment because plaintiff failed to present evidence sufficient to show that employer's explanation was unworthy of belief in Title VII action); *Woroski v. Nashua Corp.*, 31 F.3d 105 (2d Cir.1994) (affirming summary judgment in case charging discrimination in violation of the Age Discrimination in Employment Act because plaintiffs failed to raise triable issue of fact that defendant's decisions were motivated by age); *Wallis v. J.R. Simplot Co.*, 26 F.3d 885 (9th Cir.1994) (affirming grant of summary judgment

because plaintiff failed to present evidence that the employer's stated reason for the discharge was a pretext for discrimination in violation of Title VII); *Mike v. Haylor, Freyer, & Coon, Inc.*, 169 A.D.2d 911, 564 N.Y.S.2d 630 (3d Dept. 1991) (upholding summary judgment dismissing age discrimination complaint because plaintiff failed to raise a question of fact as to whether she was terminated because of discriminatory, rather than legitimate business, reasons); *Ioele v. Alden Press, Inc.*, 145 A.D.2d 29, 36, 536 N.Y.S.2d 1000, 1004 (1st Dept.1989) (reversing denial of summary judgment and dismissing age discrimination claim because plaintiff failed to raise a jury issue of discrimination); *Piekielniak v. New York State Dept. of Health*, 116 A.D.2d 839, 497 N.Y.S.2d 510 (3d Dept.1986) (affirming dismissal of complaint where substantial evidence supported the determination that a female employee was dismissed from her position because of budget cuts, rather than age or sex discrimination); *Powe v. Albany County Dept. of Employment and Training*, 108 A.D.2d 997, 485 N.Y.S.2d 147 (3d Dept.1985) (affirming dismissal because plaintiff failed produce any evidence establishing discrimination on the basis of race where plaintiff was one of fifteen employees discharged as a result of funding cuts, and fourteen of those discharged were white).

rate expanded liability and remedies available in mixed motive cases under the Civil Rights Act of 1991 into the New York Human Rights Law). The burdens of proof differ depending on whether the case involves pretext discrimination or mixed motive analysis.

*Pretext Cases*

■ The Supreme Court has developed a three-step burden-shifting analysis to be used in pretext cases. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973); *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). A plaintiff first must establish a *prima facie* case of discrimination, typically consisting of proof that he or she was: (1) a member of a protected class, (2) qualified for the position, and (3) discharged in circumstances giving rise to an inference of discrimination.[9] If the plaintiff carries that burden, the defense must articulate a legitimate, independent, nondiscriminatory reason for its action, and this operates to rebut a presumption of discrimination established by plaintiff's *prima facie* case. Then the plaintiff must show by a preponderance of the evidence that the defendant's proffered reasons are only a pretext for discrimination. As the Supreme Court recently clarified, the plaintiff in all events bears the ultimate burden of persuading the trier of fact that discrimination played a role in the decision, despite these shifts in the burden of production. *St. Mary's Honor Ctr. v. Hicks,* — U.S. —, —, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993); *see also Cook v. Shelburne Arrowsmith,* 40 F.3d 1237 (2d Cir. 1995).

■ *Hicks* was significant also for explaining in detail how plaintiffs must satisfy their burden of rebutting the defendant's nondiscriminatory reasons. The *Hicks* Court held that "a reason cannot be proved to be 'a pretext *for discrimination'* unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." — U.S. at —, 113 S.Ct. at 2752 (emphasis in the original), *quoted in Gallo,* 22 F.3d at 1225. In the summary judgment context, this means that plaintiff "must establish a genuine issue of material fact either through direct, statistical, or circumstantial evidence as to whether the employer's reasons for discharging is false *and* as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision." *Gallo,* 22 F.3d at 1225 (emphasis in the original).

*Mixed Motive Cases*

■ Some plaintiffs proceed on a mixed motive theory, which is shaped by *Price Waterhouse, v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) and *Mt. Healthy Cty. School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Mixed motive theory acknowledges the possibility that an employment decision may have been motivated by both legitimate factors and impermissible discrimination. To trigger mixed motive analysis, a plaintiff initially must present "more focused" evidence of discrimination than is required to establish a *prima facie* case under pretext analysis. *Tyler,* 958 F.2d at 1181, 1185. The plaintiff must adduce evidence, the exact nature of which has been much debated,[10] that discrimination was a motivating or substantial factor in an adverse employment decision. If the plaintiff meets this burden, then the burden shifts to the employ-

9. Plaintiff's burden of establishing the *prima facie* case is "not onerous." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1094.

10. *Price Waterhouse* involved four separate opinions, and four Justices voted for the proposition that a plaintiffs must adduce "direct evidence" of discrimination as a precondition to shifting the burden in mixed motive analysis. *Tyler,* 958 F.2d at 1183. Nevertheless, many circuit courts, but not the Second Circuit, have engrafted this requirement into case law and differed widely over the meaning of direct, as opposed to indirect, evidence *Id.* at 1183–84; *see also,* Note, Michael A. Zubrensky, *Despite the Smoke, There is No Gun: Direct Evidence Requirements in Mixed–Motives Employment Law After* Price Waterhouse v. Hopkins, 46 Stan.L.Rev. 959, 969–978 (1994) (discussing the varying approaches taken by the circuits in assessing the amount and type of evidence permitted to trigger mixed motive analysis in the wake of this ambiguity in *Price Waterhouse* ).

er to show that the same decision would have been reached even in the absence of the impermissible factor. *Price Waterhouse,* 490 U.S. at 244–45, 109 S.Ct. at 1787–88 (Brennan, J., joined by Marshall, Blackmun, and Stevens, JJ.); *id.* at 259, 109 S.Ct. at 1795 (White, J., concurring); *id.* at 276–77, 109 S.Ct. at 1804–05 (O'Connor, J., concurring); *Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. at 576.

In defining the evidence required to trigger mixed motive analysis, the Second Circuit initially adopted an unrestrictive evidentiary standard, as set forth in *Tyler.* The Second Circuit there concluded that, for purposes of jury instructions and summary judgment, the proof required to trigger mixed motive analysis was the same as plaintiff's burden in the last step of pretext analysis, i.e., sufficient to rebut the defendant's nondiscriminatory reason. 958 F.2d at 1185. The evidentiary standard was unrestrictive because *Tyler* permitted plaintiff to use "either 'direct' or 'circumstantial' evidence." *Id.,* at 1185–86. But approximately three months later, in *Ostrowski v. Atlantic Mut. Ins. Cos.,* 968 F.2d 171 (2d Cir.1992), the Second Circuit held that "circumstantial evidence must be tied directly to the alleged discriminatory animus." 968 F.2d at 182. A plaintiff must "present[ ] evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude" in an amount "sufficient to permit the factfinder to infer that that attitude was more likely than not a motivating factor in the employer's decision." *Id.*[11]

*Plaintiff's Failure to Carry His Burden of Proof*

Summary judgment is appropriate in either a pretext or mixed motive framework. In this case, plaintiff has failed to meet his burden of presenting evidence raising a triable issue about whether discrimination played a role in his discharge.

*Pretext Analysis*

In pretext analysis, the first question is whether plaintiff presented evidence sufficient to establish a *prima facie* case of discrimination.

■ A rational trier of fact could conclude that the first element of the *prima facie* case, that plaintiff was a member of a protected class, was satisfied. Plaintiff's own testimony that he was treated by a psychiatrist and taking anti-depressant drugs, his alleged conversations with Chicago Title workers disclosing this information, and the record of treatment by Dr. Oguro together could establish that he suffered from depression. Depression is a mental disability falling within the purview of the New York Human Rights Law. *Balzac v. Columbia University Press,* 114 A.D.2d 792, 495 N.Y.S.2d 45 (1st Dept.1985) (treating manic depression and treatment with lithium medication as a mental impairment within the meaning of the New York Human Rights Law and the federal Rehabilitation Act of 1973); *cf. Stradley v. Lafourche Communications, Inc.,* 869 F.Supp. 442, 443 (E.D.La. 1994) (stating that depression and other mental illnesses qualify for protection under the federal Americans with Disabilities Act).[12]

---

**11.** One commentator characterizes the Second Circuit's current evidentiary standard under *Ostrowski* as a "circumstantial-plus" standard. Zubrensky, *supra* note 10, at 970, 972.

**12.** The Americans with Disabilities Act ("ADA") and the 1973 Rehabilitation Act ("Rehabilitation Act") are, in many respects, federal analogues to the New York Human Rights Law provision prohibiting discrimination on the basis of disability. Although the wording of the definition of disability under the New York Human Rights Law varies from the definition of disability shared by the ADA and Rehabilitation Act, the legislative history of the New York Human Rights Law clarifies that New York contemplated coverage of the same types of disabilities covered by the federal laws.

The New York Human Rights Law, codified in N.Y.Exec.L. § 292, subd. 21 (McKinney 1993), defines "disability" as:

"(a) a physical mental or medical impairment resulting from anatomical, physiological or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques or (b) a record of such an impairment or (c) a condition regarded by others as such an impairment, provided, however, that in all provisions of this article dealing with employment, the term shall be limited to disabilities which do not prevent the complainant from performing in a reasonable manner the activities involved in the job or occupation sought or held."

Plaintiff has satisfied also, for summary judgment purposes, the second element of the *prima facie* case. Notwithstanding plaintiff's problems with bookkeeping and late titles, plaintiff's long history with Ticor, his continuation as an officer immediately after the acquisition of Ticor by Chicago Title, and his receipt of an integration bonus during his tenure at Chicago Title provide a basis for a trier of fact to conclude that he was generally qualified for the position he held before being terminated.

Plaintiff has failed, however, to raise a genuine issue with respect to the third element of the *prima facie* case, that plaintiff was discharged in circumstances giving rise to an inference of discrimination. Even on the view of the evidence most favorable to plaintiff, the record establishes that Cortellessa, Carter, and Zimmerman alone had knowledge of plaintiff's alleged disability. By plaintiff's own admission, however, Cortellessa responded sympathetically and encouragingly about plaintiff's need for treatment by a professional. Plaintiff conceded also that Carter and Zimmerman showed no shock or surprise or indication of hostility when he told them of his treatment for depression. Furthermore, there is no evidence that Carter or Zimmerman, neither of whom had anything to do with Fitzgerald's termination, repeated any conversation about plaintiff's depression to anyone who was in-

volved.[13] Nor does plaintiff point to any comments, innuendo, or disparate treatment that indicate animus toward his disability, either before or at the time of the termination.

The heart of plaintiff's claim seems to be that the timing of the discharge—shortly after he voluntarily revealed his disability—establishes a basis for a fact finder to infer discrimination. The Court disagrees. While plaintiff's burden in establishing a *prima facie* case is not heavy, the absence of evidence showing underlying animus, as well as the sympathetic to neutral reactions of people he had informed, both undercut any assumption of animus based purely on timing.

Even if the timing of the discharge did permit an inference of discrimination sufficient to support the third element of plaintiff's *prima facie* case, defendant has met its burden of demonstrating a reasonable, independent, nondiscriminatory motive for the discharge. The discharge of more than fifty employees prior to plaintiff's termination, including people without disabilities, combined with the reorganization of the New York office, negates any presumption of discrimination established by the *prima facie* case. *See Hicks,* —— U.S. at ——, 113 S.Ct. at 2747 (explaining that " '[i]f the defendant carries this burden of [producing a legitimate, non-

---

This three-pronged definition covers individuals who have an actual impairment, have a record of an impairment, or are regarded as having an impairment.

The Rehabilitation Act and the ADA provide a similar, three-pronged definition of disability. 29 U.S.C. § 706(8)(B) (Rehabilitation Act definition); 42 U.S.C. § 12102(2) (ADA definition). However, the category of disability pertaining to actual impairment is defined in the ADA and Rehabilitation Act as having "a physical or mental impairment which substantially limits one or more major life activities" of the individual.

The different language in the New York and federal laws in defining disability based on an actual impairment is not significant in light of the legislative history of the New York Human Rights Law, which was designed to cover persons with physical or mental impairments which substantially limit one or more major life activities. Executive Dep.Mem., 1983 McKinney's Session Laws of N.Y., at 2705 *cited in Ashker v. International Business Machines Corp.,* 168 A.D.2d 724, 563 N.Y.S.2d 572 (3d Dept.1990). Consequently, the legislative history of the New

York Human Rights Law brings the conceptual definition of disability under that statute in line with federal disability anti-discrimination laws.

**13.** In his affidavit opposing the motion for summary judgment, plaintiff avers a "sincere belief, backed by the circumstances and timing of my dismissal, that I was terminated because Ms. Carter and/or Ms. Zimmerman were repulsed by the idea that I was seeing a psychiatrist for depression and taking anti-depressant drugs." (Fitzgerald Aff. 7, ¶ 24). Although plaintiff may hold this belief sincerely, the fact remains that he has failed to offer a scintilla of evidence about repulsion or that, assuming repulsion existed, it played a role in the decision to terminate him. A plaintiff is not entitled to a trial based on pure speculation, no matter how earnestly held. *Goenaga,* 51 F.3d at 18 (summary judgment motion " 'will not be defeated merely on the basis of conjecture or surmise.' ") (citing *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991)).

discriminatory reasons for the discharge], the presumption raised by the *prima facie* is rebutted' ... and 'drops from the case'") (citing *Burdine*, 450 U.S. at 255, 255 n. 10, 101 S.Ct. at 1095, 1095 n. 10); *cf. Piekielniak*, 116 A.D.2d 839, 841, 497 N.Y.S.2d 510, 511 (substantial evidence supported the finding that employee was dismissed from her position because of budget cuts, rather than age or sex discrimination); *Powe*, 108 A.D.2d 997, 998, 485 N.Y.S.2d 147, 148 (plaintiff's race discrimination claim was undermined by evidence that plaintiff was one of fifteen employees discharged as a result of funding cuts and that the other fourteen individuals discharged were white).

Had plaintiff raised an issue of fact as to the existence of a *prima facie* case, he nevertheless has not met his next burden: raising a triable issue of fact about whether Chicago Title's stated premise for his discharge was a pretext. To begin with, plaintiff has offered no evidence that the downsizing in connection with restructuring was false or exaggerated. Plaintiff's generalized assertions that the decision to restructure and downsize should be regarded as a red herring or a coverup for what he believes to be the true reason does not amount to evidence. *Goenaga*, 51 F.3d at 18 (plaintiff cannot defeat a motion for summary judgment "through reliance on unsupported assertions" or "on conclusory statements or on contentions that the affidavits supporting the motion are not credible."). And again, plaintiff offered no evidence, beyond his employer's mere knowledge of his disability prior to termination, to show that discrimination was the real reason for the discharge.[14] Accordingly, plaintiff has failed to meet his burden of raising a genuine issue of material fact not only as to whether the stated reason for the discharge was false, but also as to whether it was more likely than not that a discriminatory reason motivated the employer, as required by *Gallo*

and *Hicks*. *Cf. Woroski*, 31 F.3d at 109–10 (agreeing with the district court that the evidence overwhelmingly established a non-discriminatory motive for plaintiffs' dismissals and holding that plaintiffs failed to present sufficient evidence to withstand defendant's motion for summary judgment); *Wallis*, 26 F.3d at 890–91 (holding that where evidence to refute defendant's legitimate explanation is totally lacking, summary judgment is appropriate, even though plaintiff may have established a minimal *prima facie* case).

*Mixed Motive Analysis*

Plaintiff's failure to produce evidence showing animus toward his disability, along with the absence of evidence supporting an inference of discrimination, does not rise to the level of focused proof of discrimination needed to trigger mixed motive analysis under *Tyler*, as modified by *Ostrowski*. Consequently, for many of the same reasons plaintiff has failed to meet his burden of raising a triable issue of fact about discriminatory motive under pretext analysis, plaintiff has failed to raise a jury question of mixed motive discrimination.

### Conclusion

Defendant's motion for summary judgment dismissing the complaint is granted.

SO ORDERED.

14. Although the Court has determined, for purposes of summary judgment, that plaintiff presented sufficient evidence for a fact finder to conclude that he was qualified for the position he held, there is no need to reevaluate the employer's decision that Latham was the better qualified candidate for the position of New York Branch Manager. A plaintiff does not raise a jury issue merely by challenging the correctness or wisdom of a business or personnel decision; rather the Court is concerned only with whether the reason stated for the employment decision is a pretext for discrimination. *Gill*, 32 F.3d at 376; *Ioele*, 145 A.D.2d at 36, 536 N.Y.S.2d at 1004. Here, Fitzgerald has failed to offer any evidence that defendant's assessment of his qualifications relative to Latham's was influenced by consideration of Fitzgerald's alleged disability.