**Gunnar VON FEASEL, Plaintiff,**

v.

**NEW YORK CITY TAXI & LIMOUSINE COMMISSION, et al., Defendants.**

No. 93 Civ. 5607 (LAK).

United States District Court,
S.D. New York.

June 28, 1996.

Gunnar Von Feasel, Pro Se.

Deanna Waldron, Assistant Corporation Counsel, Paul A. Crotty, Corporation Counsel, for Defendants.

## MEMORANDUM OPINION

KAPLAN, District Judge.

The sole claim remaining in this case is Mr. Von Feasel's claim that he was terminated as a probationary inspector by the New York City Taxi & Limousine Commission ("TLC") by reason of his Caucasian race in violation of Title VII of the Civil Rights Act of 1964.[1] This is the Court's decision following a nonjury trial.[2]

### Facts

Plaintiff took and passed a civil service examination for the position of inspector with the TLC and was provisionally appointed to that position in 1990. Under the terms of the appointment, he was subject to termination without a hearing if the TLC determined within the probationary period that his performance was unsatisfactory. He was terminated, allegedly for unsatisfactory performance, effective on May 31, 1991, during the probationary period. He contends that the real reason for the termination was his race. In essence, he claims that his supervisor during a critical period preceding the termination, and whose evaluation played a role in the decision to terminate, was African–American and prejudiced against plaintiff on account of plaintiff's race.

Following plaintiff's training period, he was assigned to TLC Squad 1, the supervisory inspector, or supervisor, of which was Marvin Jones and the senior inspectors, or

---

1. In pretrial rulings, Judge Stanton dismissed plaintiff's retaliation claim on the ground that it was precluded by the judgment in plaintiff's prior state court action, and the undersigned dismissed the Title VII claims against the individual defendants on the authority of *Tomka v. Seiler*, 66 F.3d 1295 (2d Cir.1995).

2. The trial was conducted by the plaintiff *pro se* with the assistance throughout of his brother, a retired twenty-one year veteran of the New York City Police Department and a former first grade detective. As a review of the trial transcript will reveal, plaintiff is an intelligent and articulate individual who, despite a lack of formal legal training, effectively represented himself and, indeed, performed better than some attorneys.

seniors, of which were Leander Yarrell and a man named Goldstein.[3] Jones and Yarrell are African–American, but plaintiff had no difficulty during, and admitted at trial that he makes no allegation of racial discrimination concerning, the period while he was in Squad 1. In February 1991, Supervisor Jones gave him a periodic personnel evaluation and rated his overall performance as "good."

On February 17, 1991, Squad 1 was broken up and plaintiff was assigned to Squad 4 where he again found himself under Supervisor Jones and Senior Yarrell.[4] That is when the trouble appears to have begun.

The TLC contends that plaintiff, shortly after being assigned to Squad 4, began to evidence overly aggressive and physical behavior toward drivers regulated by the Commission, that he resisted efforts to change his attitude, and that it ultimately decided to fire plaintiff because his quick and excessive resorts to force were unacceptable. Although plaintiff admits much concerning the incidents in question, he characterizes his actions as appropriate, the TLC's contentions as exaggerated, and the complaints of his superiors as racially motivated and pretextual. The Court finds the following to have occurred:

On March 25, 1991, plaintiff was assigned to radio motor patrol with Inspector Glenn, who is African–American. Plaintiff and Glenn stopped another vehicle in Queens, and plaintiff exited his car to approach the other driver. While plaintiff was on foot, the driver of the stopped vehicle put his car in gear and sped off, passing very close to plaintiff. Plaintiff was enraged and quickly returned to his vehicle, and he and Glenn took off in pursuit of the car. Another TLC car, manned by Inspectors Csikortas (white) and Graham (African–American) was in the vicinity, saw the attempted sideswipe of plaintiff,

and followed plaintiff in the chase. All three cars proceeded through Queens at a high rate of speed.

At Sutphin Boulevard and South Road, Supervisor Jones saw all three cars run through a red light and followed, ordering via public address system[5] that the chase be broken off. The TLC cars did not respond to the order. In the course of the chase, they ran a number of red lights and raced past a school bus that was discharging children, all at a high rate of speed. Eventually, the fleeing subject entered the Van Wyck Expressway, and the first two TLC cars pulled to the side of the road. Supervisor Jones arrived, jumped out of his car, encountered Csikortas first, and angrily and profanely asked what he was doing. At about that time, Senior Yarrell arrived on the scene. Jones directed Yarrell to collect the memo books of the four TLC inspectors, sent the inspectors and Yarrell to 125th Street off Sutphin Boulevard, paused to collect himself, made identical entries critical of each of the inspectors in their memo books, and then followed to the 125th street location where he had Yarrell distribute the memo books to the inspectors. Even assuming the truth of plaintiff's contention that TLC inspectors, with the knowledge and acquiescence of seniors and supervisors, often pursued fleeing subjects of car stops and exceeded posted speed limits in doing so,[6] the Court finds that the actions of the plaintiff and the three other inspectors on this occasion well exceeded any norm, endangered the lives and well-being of the inspectors and the public, and properly was the subject of censure by Supervisor Jones—censure that was meted out in equal portions to two black and two white inspectors.[7]

On April 2, 1991, plaintiff was involved in another incident. During the course of an-

---

3. In the TLC hierarchy, "inspectors" are analogous in rank to police department patrolmen, "seniors" to sergeants and "supervisors" to lieutenants.

4. Squad 4 was smaller than the former Squad 1 and, in consequence, had only one senior.

5. His radio was not functioning properly.

6. It is difficult to believe that TLC inspectors catch many fleeing New York City taxis or gypsy cabs without exceeding posted speed limits.

7. On March 28, 1991, Jones saw Csikortas and one of the African–American inspectors who had been involved in the chase and warned them that their best interests would be served by changing their behavior.

other vehicle stop, plaintiff and his partner for the day, Inspector Csikortas,[8] got into an altercation with the driver. When Jones responded to their call for back up, plaintiff claimed that the driver, an elderly man, had tried to attack plaintiff with a bat. Upon being questioned by Jones, the driver contended that he had given plaintiff his license and registration without difficulty, that plaintiff and his partner had been unnecessarily physical, and that the driver had not used the bat.

On the following day, April 3, 1991, there was still another episode, this one at 234th Street and White Plains Road. Yarrell reported to Jones that he had seen plaintiff and Inspector Glenn try physically to remove a driver of a for-hire-vehicle (i.e., gypsy cab) from his car. While Yarrell indicated that he had concluded that the stop was appropriate, he concluded that the attempt to pull the driver out of the vehicle was improper and that plaintiff, who had no authority to make arrests, had been overly aggressive. Jones reported the incident to Assistant Director Allen, who convened a meeting with plaintiff, Jones and Yarrell on the same day at which plaintiff was reprimanded for being aggressive with drivers.[9] But this did not end the problem.

On April 24, 1991, Yarrell reported to Jones that he again had seen plaintiff use unnecessary force in another car stop, this one in Brooklyn. The stop initially was made by Inspectors Nieves and Csikortas, who had a problem with the driver and called for assistance. A crowd gathered. Plaintiff and Inspector Glenn were among those who responded. Yarrell reported that he arrived in time to see plaintiff slam the driver against the car with his full body weight and then fall to the ground on top of the driver. Jones himself saw plaintiff drag someone out of a produce store in the midst of general disorder, although he was unaware of any

basis for plaintiff having done so in view of the fact that plaintiff was not permitted by TLC policy to make arrests. Plaintiff, it should be noted, admitted at trial that he had a physical altercation with the driver, although he claimed that he was provoked.

Five days later, plaintiff was on patrol with Inspector Graham, and the two made a car stop at Intervale Avenue and Southern Boulevard. On the following day, Graham reported to Senior Yarrell that plaintiff, in the apparent belief that the driver, Eladio Quinones, had hit Graham, placed Quinones in a head lock [10] and nearly choked him. Plaintiff then insisted that Graham handcuff Quinones, persisting even after Graham told him that Quinones had done nothing wrong. Yarrell reported also that Quinones complained about the incident to TLC.

When Yarrell's report came to the attention of Assistant Director Allen, Allen called Graham to his office and questioned him regarding the incident. Graham asked that he not be assigned to work with plaintiff again, as plaintiff had a reputation for being overly aggressive in handling gypsy cab drivers. He recounted the April 29 incident, telling Allen that plaintiff had placed the driver in a choke hold for no apparent reason and refused to release him until Graham pleaded with him to do so.

On the same day that Graham reported to Allen, Mr. Quinones filed a written complaint against plaintiff with TLC's disciplinary unit. (DX 20) He stated that plaintiff attacked him without provocation, choked him until he became dizzy, lifted him off the ground by his neck, threw him against the car, threatened to bash his head in with plaintiff's walkie-talkie, and called him an "asshole." (*Id.*)

Allen promptly took the matter up with Joseph Midolo, then Assistant Commissioner for Enforcement. After hearing what re-

---

8. TLC, unlike the New York City Police Department, changed partner pairings frequently, as often as daily.

9. There was another meeting later in April at which Allen saw Jones and most of the members of Squad 4 in an effort to bring peace to what quite clearly was a troubled group. There was conflicting testimony as to whether plaintiff on

that occasion complained to Allen of alleged racial bias on the part of Jones and Yarrell. In view of the basis of the Court's disposition of this matter, that conflict need not be resolved.

10. Plaintiff admitted at trial that he placed the driver in a wrestling hold, although he claimed it was a half Nelson, not a choke hold.

portedly had transpired, Midolo directed Allen to contact Elise McKay, then Deputy Counsel in TLC's Disciplinary Unit, to request an investigation.[11] He also authorized plaintiff's reassignment from the Enforcement Division to the Safety and Emissions Division in order to get him "off the street," a reassignment that took place on May 13, 1991.

On May 7, 1991, plaintiff was in the inspectors' room at TLC headquarters in Woodside, Queens, which is located down the hall from a hearing room. Plaintiff heard yelling and screaming from the hearing room and went there to see what was going on. The source of the noise was an angry respondent. The inspector in the hearing room with the irate respondent was a short woman. Inspector Herbert Miller was standing in the hall watching what was transpiring through the door. Yet another inspector, Audrey Scrivens, who was assigned to hearings at the time, appeared and asked plaintiff to leave. Plaintiff, who claims that Miller asked him to stay, responded in substance that if there was going to be a problem, he would rather be in it than out of it and threatened to lock up the respondent. Scrivens then called Midolo and reported that plaintiff had threatened to assault the respondent at the hearing and refused to leave when requested.

Shortly after the hearing room incident and plaintiff's transfer to Safety and Emissions, Supervisor Jones completed a formal evaluation of plaintiff's work in Squad 4. (DX 6) Although plaintiff was rated "good" in certain respects, Jones rated him as "unsatisfactory" in dealing with the public and wrote:

"There has been a reversal in this employee's attitude and demeanor when dealing with the FHV Industry and public. His 'new demeanor' and attitude are in direct contrast with what he was taught in training or to which he maintained or displayed during the previous evaluatory period. He's been involved in numerous situations which could have been avoided had he not been of such a negative nature! Employee has been counseled by supervision and management."

In the general comments section of the evaluation form, Jones wrote that plaintiff challenged and disregarded many agency policies and procedures including those governing car stops, the issuance of summonses and the use of force. Jones complained also that plaintiff's attitude was affecting the actions of his peers. (DX 6)

Once Allen received plaintiff's evaluation, he consulted McKay by phone regarding the progress of her investigation. He was informed that the information gathered thus far—which by that time included interviews by investigators with Graham and a bystander who happened to see part of the April 29 incident—corroborated the contention that plaintiff had used excessive force in the field. Allen therefore recommended to Midolo that plaintiff be terminated. Midolo, after clearing the recommendation with Human Resources Director Marcia Gottdiener, recommended to the First Deputy Commissioner that plaintiff be terminated for his excessive use of force. The recommendation was approved, and plaintiff was terminated, effective May 31, 1991.

Plaintiff claims that his termination was the product of racial discrimination by Jones and Yarrell. He contends that both were prejudiced against white and Hispanic officers as evidenced by repeated racial remarks and disparate treatment of employees. He argues that Assistant Director Allen was aware of, but ignored, the charges of bias against them and that the input of Jones and Yarrell into the termination decision—which was made by persons all of whom were white save Allen, who is part African-American and part Hispanic—infected the entire process.

The Court finds that there is no credible evidence of any racially disparate treatment. The claims of direct evidence of racial animus are somewhat more troublesome.

Plaintiff claims that Jones once called him a "stupid white boy" and called Inspector Judith Johnson, a white woman, a "white bitch," a charge that Johnson corroborated at trial. Plaintiff testified that Jones asked plaintiff, who weighs approximately 300

---

11. It appears that McKay did not know of the Quinones complaint at the time of Allen's call.

pounds and wears his hair in a pony tail, whether "all white boys eat that good" and whether plaintiff's hair style was a "white boy's haircut."

Jones denied these accusations. Moreover, plaintiff was confronted on cross-examination with his deposition testimony, where he stated that none of the defendants, who originally included Jones and Yarrell, ever had directed any racial comments at plaintiff. He sought to explain this conflict, first by stating that he so responded at the deposition because he initially took the comments as "good natured kidding" and then, contradicting himself again, by stating that he had not remembered the comments at the time of the deposition.

Having considered carefully all of the evidence on this point, the Court concludes that plaintiff and Johnson both were regarded by Jones as problem employees, plaintiff at least for very substantial, racially neutral reasons.[12] It is possible that Supervisor Jones, in a moment of anger or frustration, made one or more offensive comments, and the Court is inclined to believe that he referred to Ms. Johnson as a "bitch." In the last analysis, however, it is unnecessary to resolve this point.

Given what has been said, it is perfectly clear that there is not a shred of evidence to suggest that Messrs. Allen and Midolo, Ms. McKay or the First Deputy Commissioner bore the slightest racial animus against the plaintiff. Nor, given the evidence of record, is there credible evidence that Jones' actions toward plaintiff were motivated or influenced by any racial animus toward plaintiff, irrespective of whether he made inappropriate remarks which, if made, may well have been made in jest. Given the entire record, the Court is persuaded that plaintiff's actions would have resulted in his termination irrespective of any racial animus on the part of Jones, if indeed there was any.

*Discussion*

In order to establish a *prima facie* case of racial discrimination in a pretext case, the plaintiff must demonstrate that (1) he belongs to a protected class; (2) his job performance was satisfactory; (3) he was discharged; and (4) the discharge occurred in circumstances giving rise to an inference of racial discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973); *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981); *Quaratino v. Tiffany & Co.,* 71 F.3d 58, 64 (2d Cir.1995); *Dryden v. Tiffany & Co.,* 919 F.Supp. 165, 166–67 (S.D.N.Y.1996).[13] If the plaintiff establishes a *prima facie* case, the defendant must come forward with legitimate, non-discriminatory reasons for their action. At that point, the burden shifts to the plaintiff to show that the stated reasons for the action are pretextual *and* that race was a factor in the decision. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 2746–47, 125 L.Ed.2d 407 (1993); *Gallo v. Prudential Residential Services, L.P.,* 22 F.3d 1219, 1225 (2d Cir.1994).

Where there is "more focused" evidence of discrimination than is required to establish a *prima facie* case under *McDon-*

12. Plaintiff's physical aggressiveness was not the only problem. He had his own view of his job and on occasion refused to take instruction from his superiors when it conflicted with that view. One example concerned the issuance of universal summonses.

Many of TLC's inspectors are designated by the City as special patrolmen, although plaintiff never was so designated. As plaintiff learned during his training period, only special patrolmen are authorized by TLC to issue universal summonses. In March 1991, plaintiff was present in a group of inspectors, most of whom were special patrolmen, when Chief Supervising Inspector Friberg encouraged the use of the universal summonses.

Plaintiff took this as justification for his doing so despite the fact that he was not a special patrolman. While this may have been understandable, plaintiff refused to desist after Supervisor Jones made clear that Friberg's general remarks applied only special patrolmen.

13. Defendant argues that the plaintiff in a "reverse discrimination" case such as this must present evidence suggesting that "the defendant is that unusual employer who discriminates against the majority." *See Olenick v. New York Telephone Co.,* 881 F.Supp. 113, 114 (S.D.N.Y. 1995). There is no need to determine this point in light of the Court's conclusion.

*nell Douglas,*[14] a plaintiff may proceed on a mixed motive theory. In such cases, the employer is entitled to prevail if it can demonstrate that it would have reached the same decision even if race had not been a motivating factor. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 244–45, 109 S.Ct. 1775, 1787–88, 104 L.Ed.2d 268 (Brennan, J., joined by Marshall, Blackmun, and Stevens, JJ.), *id.* at 259, 109 S.Ct. at 1795 (White, J., concurring), *id.* at 276–77, 109 S.Ct. at 1804–05 (O'Connor, J., concurring) (1989); *Fitzgerald v. Alleghany Corp.,* 904 F.Supp. 223, 228–29 (S.D.N.Y. 1995).

 The analysis of this case under the governing standards is clear. Viewing the case under the *McDonnell Douglas* standard, plaintiff has failed to prove a *prima facie* case because the Court finds that his job performance in fact was unsatisfactory. The evidence clearly establishes that plaintiff resorted to the use of force far too readily and enthusiastically. Moreover, in view of the Court's finding that Messrs. Allen and Midolo, Ms. McKay and the First Deputy Commissioner all acted without, and Supervisor Jones was not influenced by, any racial animus, plaintiff's termination did not occur in circumstances giving rise to an inference of discrimination. Even if plaintiff had made out a *prima facie* case, the Court finds that TLC's stated reason for termination was valid and not pretextual.

The same result would follow if the case were viewed as one involving mixed motives. The Court is persuaded that TLC would have reached the same result absent any improper influences if, indeed, any improper influences existed.

Plaintiff offered a good deal of evidence the object of which was to show that TLC inspectors frequently engage in a great variety of actions that violate stated TLC policy in a number of respects and that their supervisors wink at or encourage such practices. His object was to prove that some of the grounds on which Jones criticized his actions were pretextual in the sense that similar actions by others were overlooked.

The Court has little doubt that there is a good deal of truth in many of the assertions made by plaintiff. It is persuaded, for example, that TLC inspectors pursued gypsy cabs and that multiple car stops were made in an effort to keep the volume of summonses issued at desired levels, both in violation of stated agency policy. Thus, there may be merit to the assertion that plaintiff's immediate superiors faulted actions by plaintiff that were overlooked in other cases. If they did so, however, they did so in an effort to deal with a difficult employee and not for racial reasons. Moreover, the evidence is overwhelming that plaintiff was terminated because he was overly aggressive and physical with drivers, not because he committed violations of TLC policies of types that were overlooked for others.

*Conclusion*

In the last analysis, there is something to be said on behalf of both sides of this case, as there is in virtually all such cases. Plaintiff did his job properly by his lights. His view of his job and that of his superiors, however, were not in accord. As the consequences of that disagreement for plaintiff began to become apparent, he attributed his difficulties to race rather than admit to himself that his superiors had the ultimate authority to determine what performance was acceptable and that his conduct fell short of that mark. In all sincerity, he sought to fit everything that happened to him and others into this mental framework. That is why this lawsuit was brought and proceeded to trial. Ultimately, however, the Court is persuaded that racial animus played no part in TLC's decision to terminate plaintiff and that TLC would have terminated plaintiff in any event. Accordingly, this action is dismissed.

The foregoing constitute the Court's findings of fact and conclusions of law.

SO ORDERED.

14. *Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1181, 1185 (2d Cir.), *cert. denied,* 506 U.S. 826, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992).