■ ALBERT STEPHENSON et al., Respondents, v HOTEL EMPLOYEES AND RESTAURANT EMPLOYEES UNION LOCAL 100 OF THE AFL-CIO et al., Appellants. [787 NYS2d 289]—

Judgment, Supreme Court, New York County (Jane Solomon, J.), entered November 1, 2002, which, after a jury trial, awarded damages to plaintiffs Albert Stephenson and Leroy Hodge on their causes of action for age discrimination against defendants Hotel Employees and Restaurant Employees Union Local 100 of the AFL-CIO and Hotel Employees and Restaurant Employees International Union, the appeal from which brings up for review an order, same court and Justice, entered on or about January 24, 2003, denying defendants' motion for judgment notwithstanding the verdict pursuant to CPLR 4404 (a), reversed, on the law, without costs, defendants' CPLR 4404 (a) motion granted, the verdict set aside, the judgment in favor of plaintiffs vacated, and judgment granted to defendants as a matter of law. The Clerk is directed to enter judgment in favor of defendants dismissing the complaint.

Plaintiffs are former business agents of defendant local union (Local 100), a constituent of defendant international union (HEREIU). In the early 1990s, Local 100 was the subject of a RICO investigation by federal authorities, and faced the prospect of a government takeover. The federal investigation prompted HEREIU, on January 24, 1992, to remove Local 100's elected officers and to appoint Vincent Sirabella as the local's "International Trustee" (the Trustee). Thereafter, on June 11, 1992, the Trustee dismissed plaintiffs from their jobs. At the time plaintiffs were discharged, Stephenson was 64 years old, and had been employed by Local 100 for 13 years; Hodge was 55 years old, and had been employed by the local for seven years.

In 1995, plaintiffs commenced this action against Local 100 and HEREIU, alleging that they were victims of age discrimination, a violation of New York's Human Rights Law (Executive Law § 296). Defendants deny any discriminatory intent, and contend that the terminations were motivated solely by concerns about plaintiffs' alleged involvement in the corruption for which Local 100 was then being investigated.

At trial, plaintiffs testified that they had performed their jobs without criticism or complaint up to the time they were

terminated. They also testified that Frank Gerace, who was brought in by former Local 100 president Anthony R. "Chick" Amodeo to act as day-to-day "boss" of the local, repeatedly made negative comments about plaintiffs' ages and stated that he wanted "young blood" on the staff. Plaintiffs' former supervisor, Sergio Fermiglia, also testified that, at two staff meetings, Gerace made statements to the effect that there were "too many old people" at Local 100. However, Gerace ceased working at Local 100 upon the appointment of the Trustee in January 1992, and therefore had no involvement in the Trustee's decision to terminate plaintiffs the following June. Fermiglia retired from his job with Local 100 on January 3, 1992, prior to the appointment of the Trustee, and thus was not privy to the Trustee's reasons for terminating plaintiffs.[1]

The Trustee, who was older than plaintiffs, died prior to trial. Of the two plaintiffs, only Stephenson testified that the Trustee told him the reason for his termination. Stephenson testified that, on the day he was terminated, the Trustee called him into his office and told him "the reason you are going to be fired [is] because we need new blood, and that is the reason that we have to let all the old people go."

Defendants presented evidence placing plaintiffs' terminations in the context of Local 100's response to the federal investigation that was in progress at the time. Prior to the appointment of the Trustee, federal authorities advised HEREIU that their investigation had uncovered substantial evidence of corruption at Local 100, and that Local 100 would be taken over by the government unless HEREIU took steps to end the criminality. Among other things, the federal authorities told HEREIU that they had reason to believe that Chick Amodeo, Local 100's president, was associated with organized crime.

Upon learning of law enforcement's interest in Local 100, HEREIU retained Kroll Associates (Kroll), a private investigative firm, to conduct an investigation of the local. Thereafter, on January 24, 1992, HEREIU issued a formal "Notice of Charges" against Local 100, alleging that Local 100's officers: (1) had conducted the local's affairs in a manner "contrary to the interest of that organization resulting in a substantial loss of membership and employers previously covered by collective

---

1. We note that Stephenson testified on direct examination that, during the trusteeship, William Granfield, who worked at Local 100 under the Trustee, once asked him to leave the dais of a union meeting because "[t]hey don't want any older person like me to stay in the meeting." On cross-examination, however, Stephenson retracted that testimony, stating that Granfield never made any "age-related comments" to him.

bargaining agreements"; (2) had engaged in "financial misman-agement resulting in substantial loss of assets and revenue"; and (3) had failed to enforce existing collective bargaining agreements. Based on these charges, HEREIU appointed the Trustee to take charge of Local 100's affairs, and gave the Trustee a mandate "to take such steps as are necessary to correct the matter giving rise to the trusteeship."

On February 11, 1992, the Trustee addressed Local 100's employees (including plaintiffs), and told them that the "status quo" at the local was untenable in view of the government's ongoing investigation. The Trustee stated, in substance, that he would expect employees of Local 100 to do their jobs honestly and effectively, for the benefit of the local's members. He invited the resignation of any employee who was unwilling to adapt to the new regime.

William Kish, a Kroll vice-president, testified at trial that, in the course of his investigation of Local 100, he learned from an FBI informant that a number of Local 100 employees—including plaintiffs—were "bag men" for Chick Amodeo, the removed president of Local 100. Kish testified that he gave this information to the Trustee. Thereafter, on June 11, 1992, the Trustee terminated the employment of both plaintiffs, among other business agents.

At or close to the time plaintiffs were terminated, the Trustee also terminated business agents Stephanie Bonafante, Rocco Panaro and Stephen Amodeo (a son of Chick Amodeo), each of whom had also been implicated in the corruption at Local 100. At the time of the terminations, Bonafante was in her twenties or thirties, and Panaro and Stephen Amodeo were both in their thirties. By contrast, employees over the age of 50 who had not been connected to the corruption were not discharged. For example, a business agent named Aldo Lupano, who was in his fifties or sixties in 1992 (Hodge believed that he and Lupano were "[a]bout the same age"), continued to work at Local 100 after the imposition of the trusteeship until his death just before his 65th birthday. In fact, Lupano was one of the business agents to whom plaintiffs' work was assigned after they were terminated. Similarly, Local 100's office manager, Marge Rimmelin, who was about 54 years old in 1992, still held that position 10 years later, when this action went to trial.

In their rebuttal case, plaintiffs simply reiterated their prior testimony that they had performed their jobs properly, that they were not involved in any corruption, and that they were not aware of any accusations of corruption against themselves. The jury, after receiving a charge to which defendants objected on a

number of grounds, returned a verdict for plaintiffs, and the trial court entered judgment thereon, denying defendants' motion for judgment notwithstanding the verdict.[2]

On this record, we find that defendants' CPLR 4404 (a) motion to set aside the verdict should have been granted. Defendants met their burden of rebutting plaintiffs' prima facie age discrimination case by presenting admissible evidence of a "legitimate, independent, and nondiscriminatory reason[ ]" for the termination of plaintiffs' employment (*Ferrante v American Lung Assn.*, 90 NY2d 623, 629 [1997], quoting *Matter of Miller Brewing Co. v State Div. of Human Rights*, 66 NY2d 937, 938 [1985]). The fact defendants adduced as the reason for plaintiffs' dismissal was the Trustee's receipt of information from HEREIU's investigator that plaintiffs had been identified as "bag men" for Local 100's organized-crime-connected former president. That the Trustee fired plaintiffs after he received such damaging information about them was never controverted at trial by plaintiffs.

Although plaintiffs steadfastly denied any involvement in the corruption at Local 100, the issue at trial was not whether plaintiffs were actually corrupt. Rather, the issue was whether plaintiffs had been accused of corruption (whether or not the accusations were true) and, if so, whether those accusations actually were the reason they were dismissed. Even if it could be said that the Trustee unfairly credited the information implicating plaintiffs in the corruption (a point as to which we express no opinion), that would not render the dismissals actionable under the Human Rights Law. "The issue [in an action for age discrimination] is not whether defendants acted with good cause, but whether their business decisions would not have been made but for a discriminatory motive" (*Ioele v Alden Press*, 145 AD2d 29, 36 [1989]).

Beyond proving that the Trustee had a legitimate and nondiscriminatory reason for discharging plaintiffs, defendants presented powerful evidence—also uncontroverted by plaintiffs—that this reason was no pretext for acts of discrimination. Specifically, defendants showed that, at or about the same time plaintiffs were terminated, the Trustee terminated at least three much younger business agents of Local 100—all under the age of 40—who had also been implicated in the corruption. Meanwhile, the Trustee retained at least two employees over the age

---

**2.** Although the dissent approves of the trial court's charge to the jury that "plaintiffs were 'qualified' as a matter of law," we do not understand how one can be "qualified" for a position of this type, as a matter of law, while there are serious allegations of corruption against that person.

of 50 who had not been so implicated. Plaintiffs did not offer evidence controverting any of these facts, nor did plaintiffs offer evidence that they were replaced by younger employees or that any younger employees accused of corruption received more favorable treatment than plaintiffs had been afforded.

In sum, defendants proved, through uncontradicted evidence, both (1) that the Trustee had a legitimate, nondiscriminatory reason for dismissing plaintiffs, and (2) that age discrimination was not the real reason for the dismissals. In the face of this compelling showing by defendants, it was plaintiffs' burden to prove by a preponderance of the evidence *"both* that the reason [proffered by defendants] was false, *and* that discrimination was the real reason"* (*Ferrante*, 90 NY2d at 630, quoting *St. Mary's Honor Ctr. v Hicks*, 509 US 502, 515 [1993]). Plaintiffs failed to carry either prong of this burden of proof. To reiterate, they raised no issue of fact as to the truth of the reason defendants gave for their dismissals, nor did they raise an issue as to the truth of the facts adduced by defendants that were inconsistent with discriminatory intent, i.e., the Trustee's simultaneous termination of younger employees implicated in the corruption and his retention of older employees who had not been similarly implicated. Plaintiffs did not offer an iota of evidence to create a triable issue as either of these matters.

In the final analysis, plaintiffs' case rests entirely on plaintiff Stephenson's uncorroborated and self-serving testimony that the now-deceased Trustee told him that he was being fired because the union needed "new blood."[3] Given the uncontradicted evidence of a legitimate reason for dismissal and of objec-

---

**3.** The alleged discriminatory remarks by Gerace, the former day-to-day "boss" of Local 100, are irrelevant, given that Gerace's involvement with the local ceased upon the appointment of the Trustee in January 1992, months before plaintiffs were terminated. As to Stephenson's testimony about Granfield's alleged request, at a meeting during the trusteeship, that Stephenson leave the dais because of his age, as previously indicated, and contrary to the dissent's assertion, the record shows that Stephenson retracted that testimony before he left the witness stand (*see* n 1). While the dissent states that Granfield "did not controvert" Stephenson's testimony about the dais incident, it appears that Granfield (who testified after Stephenson) was never asked about the alleged incident—which is consistent with the testimony having been retracted. We make note of the fact that Granfield was never asked about the alleged dais incident only because the dissent seems to view the absence of any testimony by Granfield about the matter as an admission that the incident occurred as Stephenson originally testified. Contrary to the dissent's assertion, we do not make the illogical suggestion that "because Granfield . . . was not asked about the incident, Stephenson must have retracted his testimony about [it]." Rather, Stephenson's retraction explains why Granfield was not asked about the incident, not the other way around. In any event, even if the testimony about the dais incident had not been

tive facts (the ages of other employees fired or retained) negating any inference of discriminatory intent, we conclude that the Trustee's alleged statement to Stephenson—which, although ambiguous, could be construed to refer to Stephenson's age— simply does not support the verdict for plaintiffs. This is not to say that Stephenson's testimony about the Trustee's alleged statement is incredible as a matter of law. Rather, in determining whether the verdict for plaintiffs is sustainable, our focus is on the question of whether, in view of the uncontroverted evidence presented at trial, the jury could rationally conclude that the Trustee's "new blood" statement (assuming the remark was actually made and referred to Stephenson's age) was an accurate explanation of the reason for plaintiffs' termination. Given defendants' uncontroverted proof of a legitimate reason for the dismissals and of objective facts negating any inference of discriminatory intent, the Trustee's alleged statement to Stephenson was insufficient to provide a "valid line of reasoning and permissible inferences [that] could . . . lead rational [people] to the conclusion reached by the jury" (*Cohen v Hallmark Cards*, 45 NY2d 493, 499 [1978]), namely, that plaintiffs were dismissed from their jobs based on their ages, rather than based on the Trustee's undisputed receipt of information linking them to organized crime. Accordingly, since, on this record, "plaintiff[s] did not raise a question of fact concerning the falsity of defendants' proffered basis for [their] termination and that discrimination was more likely the real reason for [their] termination" (*Scott v Citicorp Servs.*, 91 NY2d 823, 825 [1997]), defendants are entitled to judgment as a matter of law.[4]

We reject the dissent's accusation that our decision "usurp[s] the jury's role." To the contrary, in determining whether the verdict can be sustained as a matter of law, we are unwilling to ignore (as the dissent does) the objective and uncontroverted facts established by the record that conclusively negate the

retracted, such testimony would be insufficient to support the verdict, for precisely the same reasons that Stephenson's testimony about the Trustee's "new blood" statement is insufficient to support the verdict.

4. The dissent attempts to distinguish *Scott v Citicorp Servs.* (*supra*) as "a case decided upon a motion for summary judgment." The dissent apparently means to suggest that the standards for a summary judgment motion differ materially from the standards for a motion for judgment notwithstanding the verdict. The dissent's suggestion is wrong. Both on a motion for summary judgment and on a motion for judgment notwithstanding the verdict, the standard for granting relief is whether, based on the evidence before the court, the movant is entitled to judgment "as a matter of law" (*see* CPLR 3212 [b]; 4404 [a]). Whether the determination is based on pretrial evidentiary submissions or on the evidence presented at trial, the legal standard is exactly the same.

claim that plaintiffs were terminated for discriminatory reasons. Whatever the reason for the terminations may have been (and, again, plaintiffs do not dispute that the Trustee had received information implicating them in corruption), that reason simply could not have been plaintiffs' ages in light of the uncontroverted evidence presented at trial. Again, plaintiffs never disputed defendants' evidence that, at the time plaintiffs were terminated, the Trustee did not discharge other older employees who had not been accused of corruption, while he did terminate those younger employees who, like plaintiffs, had been the subject of such accusations. The dissent does not even attempt to reconcile the finding of age discrimination with these established facts. Although it was the jury's prerogative to choose among the inferences that could be rationally drawn from the evidence before it, a finding of age discrimination was not, on this record, one of the "permissible inferences" (*Cohen v Hallmark Cards*, 45 NY2d at 499) the jury could choose.

In view of the foregoing, we need not reach the remaining issues raised by defendants. Concur—Andrias, Saxe, Friedman and Williams, JJ.

Mazzarelli, J.P., dissents in a memorandum as follows: On June 11, 1992, plaintiffs Albert Stephenson and Leroy Hodge were fired from their jobs as business agents for the Hotel Employees and Restaurant Employees Union Local 100 (local union or Local 100). Stephenson was 64 years old when he was fired, and had worked for the local union for about 13 years. Hodge was 55 and had been employed by Local 100 for approximately seven years. Plaintiffs sued both the local union and the Hotel Employees and Restaurant Employees International Union (international union) alleging age discrimination.

Plaintiffs' actions were consolidated, and a joint trial was held. At its conclusion, the jury found that plaintiffs' age was the determining factor in defendants' decision to discharge them, in violation of the Executive Law. The jury, and the judge who denied the defendants' postverdict motion, all of whom had the opportunity to see and hear from the witnesses firsthand, and to evaluate their demeanor, rejected defendants' contention that information received by the union after plaintiffs were fired would have led to their dismissal as of the date it was acquired, and defendants' contention that plaintiffs were fired as part of a larger scale eradication of illegal activity within their union. It awarded Stephenson back pay of $572,853 and future lost earnings, or "front pay" for an additional 0.2 years of $14,097, to total $586,950 in damages. The jury awarded Hodge back pay of $539,205 and front pay for an additional 1.5 years of $127,556, to total $666,761.

On appeal, defendants urge that the evidence was legally insufficient to support the verdict, or, alternatively, that the verdict was against the weight of the evidence. Defendants also assert that the IAS court's charge misstated the legal standard for proving age discrimination, that certain evidentiary rulings were unduly prejudicial, and that the damage awards were excessive.

## The Trial

Plaintiffs presented their own testimony, that of a former supervisor, Sergio Fermiglia, and a damages expert, Dr. Stuart Sachnin. Plaintiff Hodge testified that he was hired by the local union as a business agent on June 17, 1985. He reported to Fermiglia. His position required that he monitor restaurants that were under contract with the local union to ensure that workers were treated correctly, and that he meet with employers and negotiate grievances. Hodge disseminated information to restaurant employees, reported on a daily basis to officers at the local union, and attended weekly staff meetings.

Anthony Amodeo was the president of the local union when Hodge was hired. Sometime between 1988 and 1990, Amodeo brought Frank Gerace, a representative of the international union, into the local union to assist him. Gerace attended the weekly staff meetings, and both plaintiffs testified that Gerace made repeated comments in their presence about wanting to terminate older people from the union because younger employees were less expensive. Hodge specifically testified: "[Gerace] would wait until I go to the bathroom and he would come down the hall like he was looking for me. 'I told you I want young blood in here, I want you old people out of this union. If you don't quit I'm going to fire you.' And he repeated this every time that he [saw] me in that union."

In addition, sometime prior to 1990, the United States Attorney's Office for the Southern District of New York had commenced an investigation of the local union. It had uncovered evidence that some of the local union representatives were engaged in corruption, including giving kickbacks to individuals associated with organized crime. The government advised the local union's attorney that it intended to file a RICO complaint, but that it would consider entering into a consent decree on condition that the union revise its policies and ferret out corruption within its staff. In January 1992, the international union placed the local union under a trusteeship, and it appointed Vincent Sirabella to "immediately take charge of the administration and property" of the local union. When the trusteeship was imposed, Amodeo, who was known to be affili-

ated with organized crime, and Gerace were both removed from office.

Hodge was fired by Sirabella[1] in June 1992. However, Hodge testified that he did not learn about the investigation of union activities until Mary Shannon Little, an employee of Kroll Associates, sought to interview him. At Little's request, Hodge provided her with his bank records. However, when she asked to interview him in person, he retained an attorney and declined to answer any questions. No civil or criminal charges were brought against either plaintiff, and their personnel files, both of which were admitted into evidence, did not contain any evidence of incompetence or misconduct.

Stephenson's testimony at trial was similar to that of Hodge. Stephenson averred that Fermiglia recruited him to work at the local union because he spoke five languages. His initial duties included working as an organizer to unionize restaurants. Like Hodge, Stephenson then worked as a business agent, monitoring union contracts. Stephenson echoed Hodge's testimony about Gerace's comments. He recounted:

"In 1991, Frank Gerace [told] me personally that 'You [know] you're going to be fired. We told you. You're 64. We don't need people like your age anymore. We need now young blood to do a better job there. They want to get—to get good salary. With the money I pay you, I could pay two employees to work. Besides that, we need young blood, young face. You should now know, it's about time you look for a job. Did you look for a job Albert?'
. . .

"Sometimes in the hallway when we cross each other, he [told] me, repeat[ed] the same thing again, 'Why do you have to wait? Why do you have to wait to fire you? You're going to get fired. Everybody [knows] that. Did you look for a job'? I said, 'No, I'm not looking for a job. I want to keep my job because I love my job.' "

Stephenson also testified about an incident in 1991 when another union officer, William Granfield, directed him to leave the dais of a union meeting because the union officers wanted "young blood" to run the meeting.[2] Stephenson testified that he was never criticized for his job performance, and that Sirabella

---

**1.** Mr. Sirabella died before the commencement of the trial and he was never deposed. The IAS court precluded most statements made by him pursuant to the terms of CPLR 4519.

**2.** The majority's assertion that Stephenson "retracted [his] testimony" that Granfield requested that he leave a dais because of his age is a distortion of the record. Stephenson responded "no" to a general question of whether Granfield had made "age-related comments" to him, but he never retracted

fired him because of his age. He also testified that he did not know that the local union was being investigated until after he was fired. Stephenson specifically related that on the day he was fired, he was summoned to Sirabella's office and, upon his entering, "Sirabella [said], sit down, sit down. He says that, you know, guys, I have been telling you, everybody tell you, Gerace tell you, I have to let you go, you know. How old are you? So I repeat, Mr. Sirabella, I believe you are older than me. And he [said], well, I am going to retire myself too, and I have been telling you, everybody telling you, I bet you are 64 years old. He said, you know my age. I said well, that is the reason you are going to be fired, because we need new blood, and that is the reason we have to let all the old people go."

The majority contends that Sirabella's statement about the company needing "new blood," considered in the context of the remainder of the trial evidence, cannot sustain the conclusion that plaintiffs were subject to age discrimination. I disagree (as did the jury and the IAS court that denied defendants' motion for judgment notwithstanding the verdict). Further, appellate supposition as to whether Stephenson accurately relayed Sirabella's remarks, or whether those remarks referred to Stephenson's age, are inapposite to legal sufficiency analysis. In addition, appellate conjecture as to Sirabella's motives in making the statements is also inappropriate, especially since Sirabella was deceased at the time of trial, and testimony reflecting upon his state of mind was strictly limited based upon the dead-person statute. Our task on a legal sufficiency review is to make the narrowly circumscribed determination of whether the jury had a rational basis for its conclusion, as reflected by its verdict, that plaintiffs were subject to age discrimination.

Fermiglia, who testified on behalf of plaintiffs, stated that he was vice-president and staff director of Local 100 between 1986 and his retirement in January 1992. He supervised both Hodge and Stephenson, and attested that both plaintiffs did an excellent job, and that he had not received any complaints about either of them. Fermiglia described the structure of the local union, noting that Amodeo, as president and general manager, also supervised plaintiffs. He corroborated plaintiffs' testimony

---

his prior testimony about being asked to leave the dais. In fact, Stephenson began to relate that exact incident, at which point defense counsel appears to have interrupted him, and limited his questioning to the issue of age related comments.

Further, plaintiff's testimony should be evaluated in context. Immediately prior to the alleged "retraction," the court had instructed defense counsel to conduct cross-examination more slowly due to the fact that Mr. Stephenson "doesn't speak English as fast or fluently as [the court or counsel]."

that when Gerace joined the union and began attending weekly staff meetings, he made repeated comments that older employees should retire. Fermiglia also stated that he told plaintiffs he would fight for them if they were fired because of their age. However, plaintiffs were not terminated until after Mr. Fermiglia had resigned.

Plaintiffs' final witness was Dr. Sachnin, a vocational economic analyst, who gave his expert opinion as to projected economic losses, based upon a number of factors, including plaintiffs' work life expectancy. Sachnin opined that Stephenson's past loss of earnings, including fringe benefits, was $572,583 and his future lost earnings were $14,097. With regard to Hodge, Sachnin stated that his past lost earnings were $539,205 and his future lost earnings were $127,556. At the close of plaintiffs' case, the defense moved for a directed verdict on the ground that plaintiffs had not established a prima facie case of age discrimination. The court denied the motion.

Defendants' first witness was William Kish, a former vice-president of Kroll Associates. Kish testified that in late 1991 or early 1992, he was contacted by a coworker, Danny Sullivan,[3] about going to Washington, D.C. The purpose of the trip was to meet with Ed Hanley, the president of the international union, to discuss an ongoing investigation regarding the infiltration of organized crime in the local union. According to Kish, after the meeting he and Bob McGuire, Kroll's managing director, agreed to help eliminate organized crime from the local union. Kish testified that he asked Sirabella for a list of all the local union members, which Sirabella then gave to Sullivan. Sullivan, a Kroll employee and former FBI informant, researched the employees, and gave Kish a memo which included the names of employees who had allegedly acted as "bag men"[4] for Amodeo, or had engaged in other misconduct. Kish testified that he gave to Sirabella Sullivan's list, which constituted multiple levels of hearsay, was not admitted into evidence, and apparently included references to Stephenson and Hodge. He then stated that he turned the remainder of the investigation over to Little, also a managing director at Kroll.

Defendants' next witness was Granfield, who was the president of Local 100 at the time of trial. Through Granfield, the defense introduced the terms of the trusteeship into evidence. Granfield also testified that Sirabella had instructed him to

---

**3.** Kish testified that Mr. Sullivan died prior to the commencement of this action.

**4.** The term "bag man" refers to someone who collects illegal bribe money and delivers it to its intended recipient.

determine how many collective bargaining agreements had expired or needed to be renegotiated. He calculated this to be 300 out of the 700 existing contracts, and stated that some of the lapsed agreements were Hodge's responsibility. However, Granfield did not controvert Stephenson's testimony about the 1991 incident where he allegedly asked Stephenson to leave the dais of a meeting because of his age.

Margaret Rimmelin, the local union's secretary/treasurer and office manager, testified about Sirabella's management of the union. Rimmelin worked with plaintiffs for years and she testified that she was shocked when they were fired. She recounted how Sirabella notified the staff that individuals who wanted to keep their jobs had to meet new, higher standards. Of six business agents that were fired in the early months of the trusteeship, plaintiffs were the only two who were over 40 years old, and another agent who was over 50 was retained. Two other witnesses, Gaye Elaine Wood, an Assistant United States Attorney earlier engaged in the investigation of the union, but at the time of trial a Kroll employee, and Carmen Carrera, secretary to Sirabella, corroborated Rimmelin's testimony about Sirabella's commitment to cleaning up the union and improving its productivity.

Little, defendants' next witness, testified about her investigation of criminal activity at the union. She stated that Stephenson and Hodge, through their counsel, had refused to be interviewed, and that she had forwarded a series of reports to the federal court detailing alleged misconduct. She said that in April 1993, she provided one of the reports, which alleged misconduct by both plaintiffs, to the then trustee of the union, Henry Tamarin. Little testified that Tamarin terminated employees at her direction, but that all of the employees named in the report had either resigned or been terminated as of the date she gave him the report.

Defendants also presented a damages expert, Dr. Jerry Ira Goldman, who, assuming liability, opined as to plaintiffs' economic loss. Dr. Goldman concluded that Hodge had a wage and benefit loss of $303,654 and that Stephenson's loss was $202,121.

As noted above, the jury returned a verdict in favor of plaintiffs, which, including interest and costs, resulted in awards of $590,534.28 to Stephenson and $670,758.54 to Hodge. Defendants thereafter moved, pursuant to CPLR 4404, to set the verdict aside, or alternatively, for a reduction of the damages award. The court denied the motion, and this appeal ensued.

Discussion

By reversing the judgment appealed on the grounds of legal insufficiency, the majority has determined, upon review of the cold record before us, that "there [was] simply no valid line of reasoning and permissible inferences which could possibly lead rational [people] to the conclusion reached by the jury on basis of the evidence presented at trial" (*Cohen v Hallmark Cards*, 45 NY2d 493, 499 [1978]). I disagree, and I discern no basis for dismissing the consolidated complaints upon assessment that the jury verdict was "utterly irrational" (*id.*).

While the majority has stated that the basis for its reversal is legal insufficiency, the majority's analysis is rife with the "discretionary balancing" of evidence conducted in the less stringent weight of the evidence review, and which is not properly considered in making a determination as to legal sufficiency (*Cohen*, 45 NY2d at 499). Disagreement with the weight to be accorded particular testimony or evidence is not grounds for reversing the verdict for legal insufficiency and dismissing the complaint (*id.*).

The majority cites *Scott v Citicorp Servs.* (91 NY2d 823 [1997]), a case decided upon a motion for summary judgment, in support of reversal. The majority analogizes the two cases based upon the appellate consideration of whether a judgment is warranted "as a matter of law." However, summary judgment motions are largely made in pretrial motion practice, based upon the submissions of the parties. Here, by contrast, we are reviewing the verdict of a jury based upon a fully developed record, and the "criteria to be applied in making [the legal sufficiency] assessment are essentially [the same as] those required of a Trial Judge asked to direct a verdict" (*Cohen*, 45 NY2d at 499). Defendants made such a motion at the close of trial for judgment notwithstanding the verdict, and, contrary to the majority, I would agree with the IAS court's determination that there was sufficient evidence to allow the jury to make the factual specific determination of whether plaintiffs were subject to age discrimination.

The standards for evaluating an age discrimination case under the New York statute are identical to those under title VII of the federal Civil Rights Act of 1964. The plaintiff has the initial burden of proving, by a preponderance of the evidence, a prima facie case of discrimination by demonstrating "(1) that he[/she] is a member of the class protected by the statute; (2) that he[/she] was actively or constructively discharged; (3) that he[/she] was qualified to hold the position from which he[/she] was terminated; and (4) that the discharge occurred under circum-

stances giving rise to an inference of age discrimination" (*Ferrante v American Lung Assn.*, 90 NY2d 623, 629 [1997], citing *McDonnell Douglas Corp. v Green*, 411 US 792, 802 [1973]). If plaintiff makes this prima facie showing, the burden shifts to the employer to rebut the presumption of discrimination. To do so, a defendant must show "through the introduction of admissible evidence, legitimate, independent, and nondiscriminatory reasons to support its employment decision" (*Ferrante*, 90 NY2d at 629). If the defendant is successful, the plaintiff's prima facie case is considered rebutted and the presumption is dropped from the case (*id.* at 630). Again, the burden shifts and now the plaintiff must prove that the reasons the defendants proffer are a mere pretext for discrimination (*id.*).

Upon review of the testimony and other evidence elicited at trial, the jury had a rational basis for its conclusion that plaintiffs were fired because of their age (*Cohen*, 45 NY2d 493 [1978]). It was within the jury's province to credit Hodge's and Stephenson's testimony that they were repeatedly confronted by Gerace about their age. Although Gerace was removed when the trusteeship was implemented, Stephenson also testified that this practice continued. He swore that Granfield, president of the union under Sirabella, directed him to leave a meeting because of his age, an accusation Granfield never denied.[5] The jury also accepted Stephenson's testimony that Sirabella had told him he was being fired because of his age. As Sirabella's motives are at the crux of the relevant inquiry, the jury's acceptance of Stephenson's account provides the requisite support for its verdict. It was also within the province of the jury to reject, as pretextual, defendants' contention that plaintiffs were fired as part of a broad-scale cleanup of corrupt practices in the local union.

The majority may dislike the verdict, but the role of an appellate court on a review of legal sufficiency is circumscribed, and we must be wary of invading the province of the jury. The rec-

---

5. Grasping at straws to sustain a position created out of whole cloth, the majority asserts that Stephenson retracted his testimony about Granfield asking him to leave the subject meeting. This is a distortion of the record (*see* n 2). In addition, using leaps of logic, the majority asserts that because Granfield, who testified after Stephenson, was not asked about the incident, Stevenson must have retracted his testimony about being asked to leave the meeting. This analysis is both circular and strained. That notwithstanding, the majority does not—and cannot—controvert that an alternative permissible inference from the record is that the age-related incident happened as described by Stephenson, that Granfield did not deny asking Stephenson to leave the dais, and the incident supported plaintiffs' contention, accepted by the jury, that they were ultimately terminated because of their age.

ord on this case is sufficient to support the determination that plaintiffs were subject to age discrimination, and I discern no basis for usurping the jury's role (*see Cohen*, 45 NY2d at 500).

The Jury Charge

Defendants raise a number of challenges to the trial court's jury charge, none of which warrants reversal. Defendants first object to the following portion of the charge: "I instruct you that, as a matter of law, by virtue of their age, the plaintiffs were members of a protected class, that they were actively discharged . . . and that . . . they were qualified for the positions they were holding; that is, each was able to perform the duties of that position." Defendants argue that by giving this instruction, the court impermissibly took the question of whether plaintiffs were qualified for their jobs away from the jury. However, to establish that an employee is "qualified," a plaintiff "need not demonstrate that his performance was flawless or superior. Rather, he need only demonstrate that he 'possesses the basic skills necessary for performance of [the] job' " (*de la Cruz v New York City Human Resources Admin. Dept. of Social Servs.*, 82 F3d 16, 20 [1996]; *Powell v Syracuse Univ.*, 580 F2d 1150, 1155 [1978], *cert denied* 439 US 984 [1978]). Further, the issue of employee misconduct is distinct from the issue of qualification to perform a particular job (*Owens v New York City Hous. Auth.*, 934 F2d 405, 409 [1991], *cert denied* 502 US 964 [1991]; *Aguirre v New York State Police*, 156 F Supp 2d 305, 318 [2001]). Because no issue was raised here as to plaintiffs' competence, and neither plaintiff had received any oral or written criticism of his job performance, the court properly charged the jury that plaintiffs were "qualified" as a matter of law.

Defendants next challenge the court's instruction that "in this case . . . there are places where the burden is different and it shifts or moves, or a different party has a burden of proof." The defense contends that this portion of the charge, coupled with a later instruction that "you must consider whether the defendants have presented evidence that Mr. Sirabella had a legitimate, independent, and non-discriminatory reason to discharge plaintiff[s]," improperly placed the burden on defendants of proving a nondiscriminatory motive for plaintiffs' terminations. This argument is meritless as these instructions accurately refer to the three-step framework for evaluating discrimination claims as articulated in *McDonnell Douglas Corp. v Green* (411 US 792 [1973], *supra*) and *St. Mary's Honor Ctr. v Hicks* (509 US 502, 506-508 [1993]).

As stated earlier, once a plaintiff has established a prima facie case, "the burden of production shifts to the employer who

must defeat a rebuttable presumption of discrimination by articulating a legitimate, non-discriminatory reason" for the adverse employment action (*Byrnie v Town of Cromwell, Bd. of Educ.*, 243 F3d 93, 102 [2001]). If the employer meets this burden, the employee must be afforded the "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination" (*Texas Dept. of Community Affairs v Burdine*, 450 US 248, 253 [1981]). "Moreover, although the presumption of discrimination 'drops out of the picture' once the defendant meets its burden of production, *St. Mary's Honor Center, supra,* at 511, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual,' *Burdine, supra,* at 255, n. 10" (*Reeves v Sanderson Plumbing Prods., Inc.*, 530 US 133, 143 [2000]).

Thus, the objected-to portions of the court's charge correctly described the framework for evaluating an employment discrimination claim. More importantly, the court instructions as a whole made it abundantly clear that plaintiffs always bore the burden of proving by a preponderance of the evidence that age was a determining factor in their discharge.

Evidentiary Rulings

Defendants next contend that the trial court improperly excluded two letters, dated April 15 and June 11, 1992, from Sirabella to Kish. These, they claim, supported their contention that plaintiffs were terminated because of information Kish obtained about their alleged illegal conduct. However, each of these letters was only one sentence long and merely named employees terminated by Sirabella at Kish's request. They provide no insight into Sirabella's motive for terminating those employees, including plaintiffs. While defendants contend that the letters should have been admitted as business records, based upon Rimmelin's testimony that they had been made and kept in the ordinary course of business, this type of exceptional or one-time communication does not fall within the business record exception to the hearsay rule (CPLR 4518 [a]; *see Cornier v Spagna*, 101 AD2d 141 [1984]). Further, because the one-sentence letters do not reveal anything about Sirabella's mental state, they do not fall under the "state of mind" exception to the hearsay rule.

Defendants also argue that the court erred in refusing to admit testimony from Granfield about Sirabella's motives in firing plaintiffs. However, defense counsel's questions on this point were improper and repeatedly called for inadmissible hearsay. Plaintiffs' objections to them were properly sustained.

After-Acquired Evidence

Defendants further contend that the court erred in refusing to admit into evidence a report prepared by Little which was given to Tamarin, the trustee managing the union on or before April 30, 1993. The report describes allegations of misconduct by each plaintiff. Defendants assert that its exclusion precluded the defense from establishing plaintiffs would have been terminated as of the date it was received. The report, which is in the record on appeal, contains allegations from unnamed informants that Hodge accepted bribes from two restaurants, and that Stephenson instructed coemployees not to unionize two restaurants because they were controlled by "another" organized crime family. Plaintiffs contend that the allegations in the report constitute inadmissible hearsay.

However, this evidence was before the jury. While the report itself was not admitted into evidence, the defense introduced the underlying allegations of misconduct contained therein through the testimony of Little. Also, the jury was specifically charged that if defendants had proven that plaintiffs would have been terminated in April 1993 based upon the information given to Tamarin by Little, any award of damages should terminate as of that date. These instructions were consistent with the holding of *McKennon v Nashville Banner Publ. Co.* (513 US 352 [1995]). The verdict sheet also included questions asking the jury whether the information provided to Tamarin in April 1993 would have provided a legitimate basis for plaintiffs' discharge. The jury concluded that it would not, and appropriately disregarded the after-acquired evidence in determining damages.

Damages

Defendants contend that the damages award was excessive because plaintiffs failed to mitigate by using reasonable diligence to find other suitable employment, which need not have been similar to their previous positions (*Greenway v Buffalo Hilton Hotel*, 143 F3d 47, 53 [1998]). However, Hodge testified that after he was terminated, he went to 80 or 90 restaurants, looking for a job as a chef, but failed to get any offers. Stephenson also testified that after he was fired he looked for a restaurant job as, "manager, chef, cook, whatever I could get I would take," and that he was rejected for a position at another union. He later testified that he declined job offers that paid only $3.50 per hour, which was less than he was receiving in Social Security. This testimony was sufficient to sustain the jury award of back pay upon a finding that each of the plaintiffs made reasonable efforts to find suitable employment after they were terminated by the local union.

Defendants request that the jury's award of damages for "front pay" be vacated should also be rejected. As discussed in *Murphy v American Home Prods. Corp.* (136 AD2d 229, 234 [1988]), plaintiffs made a specific determination to assert their age discrimination claims in state court, making no request for either reinstatement or any other type of equitable relief in lieu of future lost earnings. As such, the jury was warranted in determining the issue of front pay (*see Tyler v Bethlehem Steel Corp.*, 958 F2d 1176, 1189 [1992], *cert denied* 506 US 826 [1992] [comparing *Murphy*, 136 AD2d 229 (1988), which allowed the jury to determine front pay on a state law claim, with *Whittlesey v Union Carbide Corp.*, 742 F2d 724 (1984), which discussed the court's exclusive power to determine front pay under the federal Age Discrimination in Employment Act]). Here, plaintiffs' expert testified at trial that, based upon a statistical work life expectancy, Stephenson would have continued to work for 0.2 years beyond the date of trial, and that Hodge would have continued to work for 1.5 years after the date of trial. The jury accepted this testimony, and there is no reason to disturb this aspect of the award.

However, defendants are correct in their contention that the matter should be remanded for a collateral source hearing to determine whether plaintiffs' damages should be reduced to reflect offsets in unemployment insurance (*compare New York State Div. of Human Rights v Marcus Garvey Nursing Home*, 249 AD2d 549 [1998] [offset]; *Matter of Allender v Mercado*, 233 AD2d 153 [1996], *appeal dismissed* 89 NY2d 1055 [1997] [offset], *with Meschino v International Tel. & Tel. Corp.*, 661 F Supp 254, 260 [1987] [no offset]), Social Security, and pension benefits (*Hagelthorn v Kennecott Corp.*, 710 F2d 76 [1983]; *Meschino*, 661 F Supp at 259).

Accordingly, I would affirm the jury's verdict on liability and would modify the judgment appealed by vacating the damages award only to the extent of remanding for a collateral source hearing.