OPINION OF THE COURT
Memorandum.
Order, entered March 13, 2006, reversed, with $10 costs, defendants’ CPLR 4404 (a) motion granted, the verdict set aside, judgment in favor of plaintiff vacated, and judgment granted to defendants as a matter of law. The Clerk is directed to enter judgment in favor of defendants dismissing the complaint.
Defendants’ CPLR 4404 (a) motion to set aside the verdict should have been granted. Defendants met their burden of rebutting plaintiffs prima facie sexual orientation discrimination case by presenting admissible evidence of a legitimate, independent and nondiscriminatory reason for the termination of plaintiffs employment (Ferrante v American Lung Assn., 90 NY2d 623, 629 [1997]). In this connection, defendants persuasively showed that defendant New York University Medical Center (NYUMC) terminated plaintiffs employment as a result of budgetary concerns and a departmental reorganization. The unrebutted trial evidence established that the decision to eliminate plaintiffs position was made by one Teresa Bischoff, the executive vice-president and deputy provost of NYUMC, who testified that NYUMC was facing economic pressures due to the increasing cost of health care. Bischoff explained that when she first became executive vice-president in 1994, NYUMC eliminated about 150 positions in an effort to remain financially sound and address its budgetary concerns. Layoffs were a regu *25 lar subject of discussion at budget meetings, and on the average, 20 positions were eliminated annually.
The record reveals that plaintiff worked exclusively for Martin Begun, the vice-president of external affairs, until Begun voluntarily left his employment at NYUMC in August 1997. Plaintiff began working at NYUMC as “special assistant” to Begun in or about 1991. In an attempt to strengthen or “secure” plaintiffs position in the medical center, Begun made plaintiff the director of external affairs in 1993. However, plaintiffs duties remained the same and he continued to work solely for Begun. Sometime between 1995 and 1996, Begun placed plaintiffs position on the budget of the public affairs department. Begun’s stated intention was to give plaintiff “a position that would have secured him in the hearts and minds of the leadership.” While the budget line for plaintiffs position was transferred to the public affairs department, plaintiff continued to report to and work for Begun. When defendant Ferrara was promoted to director of public affairs in April 1997 he took charge of the department’s budget, which included the line for plaintiffs position. However, plaintiff and one other NYUMC employee on Ferrara’s budget did not report to Ferrara and could not be fired by him.
Described by the dissent as “highly respected” (at 31), Begun clearly enjoyed a place of prominence within NYUMC’s management hierarchy and his departure provided the institution with the opportunity to downsize its external affairs department, which likely would not have occurred but for Begun’s departure. Thus, in anticipation of Begun’s impending departure, as well as the departure of Larry Lynn, the vice-president of development, Bischoff restructured the external affairs department. Inasmuch as plaintiff worked exclusively for Begun, whose duties and responsibilities were reassigned, Bischoff determined that plaintiffs position was no longer needed, particularly in light of the continuing economic pressures faced by NYUMC and its impending merger with Mount Sinai Hospital. Bischoff informed Begun about her decision to eliminate plaintiffs position prior to Begun’s departure. Bischoff s testimony was confirmed by other executives at NYUMC, including the vice-president for human resources.
In addition to demonstrating that NYUMC had a legitimate and nondiscriminatory reason for dismissing plaintiff, defendants presented evidence that the reason was no pretext for acts of discrimination. NYUMC showed that as a result of the reorganization in 1997, it eliminated one vice-president position *26 as well as between 20 to 24 other positions, including the position held by plaintiff. While the dissent notes the “absence of evidence as to whether the budget of the public affairs department had increased or decreased in the year following plaintiffs termination” (at 32), the crucial inquiry is whether the elimination of plaintiffs position resulted from NYUMC’s perceived need to reduce its expenses and implement new strategies in the face of increasing economic pressures (see e.g. Alvarado v Hotel Salisbury, Inc., 38 AD3d 398 [2007]), not whether NYUMC actually streamlined the budget. “It is not enough for the plaintiff to show that the employer made an unwise business decision or an unnecessary personnel move [since] . . . [t]he issue is not whether defendants acted with good cause but whether their business decisions would not have been made but for a discriminatory motive” (Ioele v Alden Press, 145 AD2d 29, 36 [1989] [internal quotation marks omitted]).
In the face of defendants’ compelling showing, the burden shifted to plaintiff to prove by a preponderance of the evidence “both that the reason [proffered by defendants] was false, and that discrimination was the real reason” (Stephenson v Hotel Empls. & Rest. Empls. Union Local 100 of AFL-CIO, 14 AD3d 325, 330 [2005], affd 6 NY3d 265 [2006] [internal quotation marks and citations omitted]). Plaintiff failed to carry either prong of his evidentiary burden. The crux of plaintiffs claim is that defendant Ferrara, who supposedly was “anti-gay,” was responsible for the decision to terminate plaintiffs employment. At the time that plaintiffs position was eliminated in 1997 Ferrara, then the director of public affairs, concededly did not work with nor supervise plaintiff. While plaintiffs evidence may have shown that there was no love lost between plaintiff and Ferrara, “mere personality conflicts must not be mistaken for unlawful discrimination” (Forrest v Jewish Guild for the Blind, 3 NY3d 295, 309 [2004]). Accepting plaintiffs assertion that “there was some conflict or problem” with Ferrara, the record evidence, even viewed in the light most favorable to plaintiff, does not support the inference that Ferrara made the decision to terminate plaintiff’s position. To the contrary, the evidence shows that the decision was solely made by Bischoff. The fact that Ferrara signed plaintiffs payroll termination form was not evidence of Ferrara’s participation in the decision to eliminate plaintiffs position since Bischoff explained, and the documentary evidence demonstrated, that NYUMC’s procedures required department heads to sign such forms. While the dissent finds *27 “damaging” that “plaintiff was terminated only four months after plaintiff was placed under Ferrara’s budget” (at 32), by Begun’s own account, the line for plaintiffs position was placed on the budget of the public affairs department in “February 1995” or “somewhere between 1995 and 1996,” prior to Ferrara becoming the director of that department. When Ferrara assumed his position as director of public affairs, he had no supervisory control over plaintiff.
Even assuming that Ferrara participated in the decision making, there was no showing of a causal relationship between the anti-gay conduct attributed to, and comments allegedly uttered by, Ferrara in 1995, and the elimination of plaintiffs position in 1997, that could conceivably demonstrate that plaintiff’s termination occurred under circumstances giving rise to an inference of discrimination. “[Statements by nondecisionmakers, or statements by decisionmakers unrelated to the decision process itself’ are insufficient to establish discriminatory intent (Forrest v Jewish Guild, 3 NY3d at 308, quoting Price Water-house v Hopkins, 490 US 228, 277 [1989, O’Connor, J., concurring]). To be sure, some of the conduct attributed to Ferrara is inexcusable. However, there was no showing that NYUMC condoned or acquiesced in Ferrara’s conduct, which, according to plaintiff, commenced soon after the 1994 publication of a book detailing plaintiffs intimate relationship with the late composer Leonard Bernstein. Unfortunately, as often happens in the workplace, it appears that plaintiff was the subject of “gossip by the water cooler.” However, this occurred a full two years before plaintiffs discharge and there is nothing in the record to suggest that his work status was in anyway affected by the disclosure of his sexual orientation. Indeed, the record conclusively establishes that NYUMC had a vigorously enforced anti-discrimination policy, designed to prohibit harassment or discrimination on the basis of sexual orientation, as well as a policy on cultural diversity and equal opportunity affirmative action. When plaintiff filed a complaint with NYUMC’s human resources department in 1995 about a comment made by Ferrara and perceived by plaintiff as discriminatory, NYUMC promptly met with Ferrara, counseling him about NYUMC’s anti-discrimination policy, and thereafter followed up with plaintiff to ensure that there were no further problems. Notably, plaintiff never filed another complaint until after his termination.
In the final analysis, plaintiffs case rests entirely on the supposition that he was terminated because Ferrara, the sole actor *28 accused of discrimination, somehow managed to convince the executives at NYUMC to discharge plaintiff. However, there is an evidentiary gap in plaintiffs case which can only, impermissibly, be filled by conjecture. There was no evidence rebutting defendants’ legitimate reason for dismissal and more importantly, no proof showing that the real reason behind NYUMC’s decision to eliminate plaintiff’s position was discriminatory animus (see e.g. Jordan v Bates Adv. Holdings, Inc., 46 AD3d 440 [2007]). Thus, viewing the evidence in the light most favorable to plaintiff, there is no valid line of reasoning and permissible inferences that could have lead rational jurors to the conclusion reached by the jury on the basis of the evidence presented at trial (see Cohen v Hallmark Cards, 45 NY2d 493 [1978]).
Were we not dismissing outright, we would remand for a new trial based on the improper admission of evidence which had little or no bearing on the events leading to plaintiffs termination. For example, although plaintiff did not allege a hostile work environment claim, he was permitted to elicit substantial evidence about incidents, most of which were too remote in time, that did not relate to the decision to eliminate plaintiffs position, and about conduct attributed to a limited number of coworkers, none of whom participated in the discharge decision. Also improperly admitted, over strenuous objection by defense counsel, was evidence of an incident involving Ferrara’s alleged inappropriate comments to a female worker, and evidence of the fact that NYUMC paid for Ferrara’s legal fees, suggesting that NYUMC was condoning any improper conduct by Ferrara. The evidentiary rulings unfairly prejudiced defendants’ case and would warrant a new trial. The record shows that the defense timely objected to the majority of the evidentiary errors during trial, thus preserving the issue for appellate review (see CPLR 4017, 5501 [a] [3]; Horton v Smith, 51 NY2d 798 [1980]). Contrary to plaintiffs contention, appellate review is not precluded by the fact that defendants’ posttrial motion to set aside the verdict did not expressly rely upon the evidentiary errors to which timely objections were made (see Rosso v Beer Garden, Inc., 12 AD3d 152 [2004]).
Lastly, were we not dismissing, we would find that the evidence did not warrant an award of punitive damages (see generally Kolstad v American Dental Assn., 527 US 526 [1999]) and that the award for damages for mental anguish, even as reduced by the trial court, was excessive and unsupported by the evi *29 dence (see Matter of Bronx Cross County Med. Group v Lassen, 233 AD2d 234 [1996]; Boutique Indus. v New York State Div. of Human Rights, 228 AD2d 171 [1996]).